# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### SEPTEMBER SESSION, 1997

**FILED**

January 14, 1998

**Cecil W. Crowson**
**Appellate Court Clerk**

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | C.C.A. NO. 01C01-9609-CR-00394 |
| | ) | |
| Appellee, | ) | |
| | ) | DAVIDSON COUNTY |
| | ) | |
| V. | ) | |
| | ) | HON. ANN LACY JOHNS, JUDGE |
| JAMES FERNANDEZ, | ) | |
| | ) | (ATTEMPTED FIRST DEGREE |
| Appellant. | ) | MURDER; FELONY MURDER) |

FOR THE APPELLANT:

**LIONEL R. BARRETT, JR.**
Washington Square Two, Ste. 417
222 Second Avenue North
Nashville, TN 37201

FOR THE APPELLEE:

**JOHN KNOX WALKUP**
Attorney General & Reporter

**EUGENE J. HONEA**
Assistant Attorney General
2nd Floor, Cordell Hull Building
425 Fifth Avenue North
Nashville, TN 37243

**VICTOR S. JOHNSON, III**
District Attorney General

**ROGER MOORE**
Assistant District Attorney General
Washington Square, Suite 500
222 Second Avenue South
Nashville, TN 37201

OPINION FILED _____

AFFIRMED

THOMAS T. WOODALL, JUDGE

# OPINION

Following a jury trial in Davidson County Criminal Court, James Fernandez, the Defendant, was convicted of one count of attempt to commit premeditated first degree murder and one count of felony murder. He was sentenced by the trial court to eighteen (18) years for the conviction of attempt to commit first degree murder and a life sentence for the conviction of felony murder. The life sentence was ordered to be served consecutively to the first sentence of eighteen (18) years. The Defendant appeals as of right and raises the following issues on appeal:

> 1) The evidence is insufficient as a matter of law to allow a trier of fact to find the Defendant guilty of attempted murder or felony murder.
>
> 2) The trial court erred in failing to instruct the jury that only first-degree murder could be considered as an underlying and predicate offense for felony murder.
>
> 3) The trial court erred in overruling the Defendant's motion for a judgment of acquittal.
>
> 4) The trial court erred in imposing consecutive sentences.

We affirm the judgments of the trial court.

SUFFICIENCY OF THE EVIDENCE

When an accused challenges the sufficiency of the convicting evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the

burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this court. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App.), perm. to appeal denied, id. (Tenn. 1987). Nor may this court reweigh or reevaluate the evidence. Cabbage, 571 S.W.2d at 835. A jury verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. Grace, 493 S.W.2d at 476.

Several witnesses testified during the State's case-in-chief. Anita Stevens, the mother of the victim of the felony murder, Jennifer Jones, stated that the victim was seventeen (17) years old at the time of her death. Jennifer was in the eleventh grade and had been dating Brian Wiggins for approximately a year and a half prior to her death. On January 19, 1994, the night the victim was killed, Jennifer had called Ms. Stevens to tell her that she and her friends were going to a movie that night. The victim's school was closed that day and the following day due to the snow and icy road conditions. She was notified at approximately 11:00 p.m. that her daughter had been shot.

Janet Land Wiggins, a friend of the victim, was at home with Jennifer and their friends on January 19. In addition to herself, the girls there included the victim, Rachel Stacey, and Lee Ann Cherry. On January 18, 1994, Janet met William Peck in a mall. The victim was with William Peck and the Defendant. On

January 19, both Peck and the Defendant came by Janet's house to visit the girls. When the girls left the house that night, Janet thought they were going to go to the movies, but instead they went to the Econo Lodge on Murfreesboro Road. When they arrived at the Econo Lodge, they went to the room where the Defendant and Peck were staying. Everyone started drinking alcoholic beverages. At that time only Peck was in the room with the girls, and he showed them a gun. Peck took the clip out and was flicking bullets at the television. Shortly thereafter, the Defendant came in and asked Peck for the gun. The two argued about the gun for a few minutes, and Peck wanted to know why the Defendant wanted the gun. Janet did not hear the Defendant's reply.

During this time, the victim and Brian Wiggins had begun paging each other back and forth on their beepers. Finally, Jennifer gave Wiggins her telephone number at the motel, and when he called she asked him to drive over to the Econo Lodge and pick her up. The victim went downstairs alone to wait in Rachel Stacey's car for Wiggins. While Janet did not know if Brian Wiggins had arrived, she saw Peck and the Defendant leave the room with the gun. She and the other girls also left the room and stepped outside onto the balcony. She saw the Defendant and Peck running down the stairs after Wiggins. Wiggins and the victim were arguing, but they were walking to get in Wiggins' car when Peck and the Defendant followed them. She saw them all arguing, with Peck and the Defendant kicking Wiggins' car to try to stop him from leaving. As Wiggins was trying to leave, Peck grabbed his door and was pulling it open. When Peck pulled the door open, he swung at Wiggins. She did not see a gun at that time.

The girls went downstairs, and Rachel and Lee Ann were yelling for her to get in their car to leave. Stephanie decided that she wanted to stay in the motel room. Janet, Rachel, and Lee Ann got in Rachel's car and were driving in the opposite direction from the exit as they did not know how to get out of the parking lot. They turned around when they realized they could not get out that way and were coming back around the motel when they saw Peck and the Defendant walking beside them and Jennifer lying on the ground. When the girls asked Peck and the Defendant what they had done, they refused to reply and only walked past them to get in the Defendant's Jeep. Defendant drove away with Peck in the car to the other side of the motel. They stopped and sat there for a few minutes, then the Jeep came back around and the Defendant was the only one in it.

Rachel Stacey testified that she was with the victim on the night of January 19, 1994. She met the Defendant and William Peck one or two days prior to the incident at the motel when Jennifer introduced them. When they left Janet's house that night, she knew they were going to the Econo Lodge to "have fun" and drink. All of them sat around, drinking and talking. She remembered that either Peck or the Defendant had a gun in the room and was playing with the bullets. During this time, Jennifer and Wiggins were beeping each other on their pagers, until finally Jennifer paged Wiggins with the telephone number of their motel. The two talked on the telephone and Wiggins said he was coming over.

When Wiggins showed up at the motel, everyone started going outside. Jennifer was already outside, waiting in the car. When she got to the balcony, she saw Wiggins arguing with Peck and the Defendant. She got in her car and

started driving. When the girls tried to get Jennifer to get in their car, she declined and chose to ride with Brian. Wiggins' car got stuck in the ice, so Rachel drove to the other side of the motel to try to find another way out. When they came back around the motel, she was too busy paying attention to her driving to notice anything. Lee Ann told her that Jennifer was lying on the ground and that they were beating up Wiggins. Rachel parked her car and went over to where Jennifer lay on the ground. She could not see any visible wounds, so she ran and got back in her car. The Defendant came over to her car then and told her that nothing was wrong with the victim, that she was just in shock. When the police arrived later, Rachel told the Defendant to get out of her car. He complied and went upstairs to his room.

Lee Ann Cherry was next to testify regarding the events of January 19, 1994. She met the Defendant and Peck earlier that day while the girls were at Janet's home. When they arrived at the Econo Lodge that night, they all sat around, played quarters (a drinking game), and drank alcoholic beverages. When they found out that Wiggins was coming over, Peck pulled out a gun from a drawer and eventually put it under a pillow. Stephanie was standing at the window when Brian arrived, and she announced that he was in the parking lot. Peck grabbed the gun and was running out the door with the Defendant running out with him. She, Rachel and Janet decided they would leave, and they ran to Rachel's car. Lee Ann saw Jennifer and Wiggins getting into their car, along with Juan Rosa. She saw Wiggins, Peck and the Defendant all wrestling on the ground, with Peck and the Defendant on top of Wiggins beating him up. She got in Rachel's car, and the next time she looked over, Jennifer was lying on the

ground. She then saw Peck and the Defendant running back towards a white Jeep.

Stephanie Lawrence testified that she had known Peck for one (1) or two (2) weeks prior to the day of the shooting. Jennifer had introduced her to Peck, and she had also later introduced her to the Defendant. While the girls were at Janet's home on January 19, Peck and the Defendant called and invited them to come over to the Econo Lodge that night. When they got to the motel room, they were all drinking and watching television. After Jennifer went downstairs to meet with Wiggins, Peck and the Defendant were under the impression that she and Wiggins were arguing in the parking lot. Stephanie knew Peck and the Defendant did not like Brian Wiggins. They ran downstairs with one of them carrying a gun, but she did not recall who possessed or owned the gun. Stephanie went out on the balcony to see what was going on downstairs, and saw Peck try to hit Wiggins through the car window. Specifically, she recalled that Peck was punching Wiggins through the window, and then she went back inside. When she went back outside, Jennifer was lying on the ground. Stephanie ran down to Jennifer and talked with her. As she could not see any blood and did not hear a gunshot, she thought the victim was only in shock.

Brian Wiggins described his dating relationship with Jennifer as "very strong." Prior to the shooting, Wiggins did not know Peck or the Defendant. He was at home when he and Jennifer started paging each other. For the first ten (10) or twelve (12) times, Jennifer only put her pager number in, but she finally paged him with the telephone number at the motel room. When he called her at the motel, she told him that there were two (2) guys there that had a gun and that

she wanted him to come pick her up. He left his home to go get Jennifer, and picked up a friend, Juan Rosa, along the way.

When they arrived at the Econo Lodge, Jennifer was in Rachel's car waiting. When Wiggins went over to her, they argued for a minute but then she decided she was ready to leave. As they were walking towards his car, Peck and the Defendant came down the stairs and started to argue with him. When Jennifer, Rosa and Wiggins got in the car and started to leave, Peck and the Defendant began to kick the side of his car. Wiggins' window was down, and Peck punched him. Wiggins got out of the car and the two began fighting. When he got back in the car, the Defendant said, "Blast him. Blast him." Peck then broke the back window of Wiggins' car, and approximately two (2) to four (4) seconds later, the gun went off. Jennifer, who was sitting in the front seat between Rosa and Wiggins, was screaming she had been shot. He could not see who had the gun when it was fired, but Peck was the one who first pulled out a gun. Rosa went to the pay phone to get help for Jennifer, who was lying on the ground in front of the car. The Defendant came over to Wiggins and apologized, stating that he was sorry it happened. Wiggins did not see Peck again that night.

Juan Rosa was the next witness to testify. He stated that he rode over to the Econo Lodge with Brian Wiggins on January 19, 1994. He was aware that Brian and Jennifer were boyfriend and girlfriend. When they arrived at the motel, he saw Jennifer sitting in Rachel's car, and they parked next to that car. Wiggins got out and went to talk to Jennifer. They talked about five minutes and were arguing when Peck and the Defendant walked up and confronted Wiggins. After arguing for several moments, Peck raised his shirt and told them to leave. As

-8-

soon as they saw the gun in the waistband of Peck's pants, Rosa, Wiggins and Jennifer went to get into Wiggins' car. Because they had problems backing up due to the ice in the parking lot, Peck and the Defendant were able to catch them and ran up to try to get Wiggins out of the car. They were trying to hit Wiggins, but Rosa was not sure if any blows were actually made. Rosa then heard the Defendant tell Peck to "Blast him. Blast him." He looked over his shoulder towards the back and observed the window being busted out, felt glass on his shoulder and then saw the flame of the gun. There was only a period of two (2) or three (3) seconds between the time the glass was broken and when Rosa saw the flame of the gun. Jennifer started to scream that she was shot. Rosa ran to get help for Jennifer.

James Bean was staying in the motel room next to where the girls, the Defendant and Peck were partying. When he believed the noise from the party was getting out of hand, Bean went outside on the balcony. He thought he heard a fight in the parking lot regarding somebody's girlfriend. He heard a lot of yelling, and then saw the Defendant walk across to a white Jeep and get something out from under the passenger's seat. He concealed it right away underneath his clothes. While Bean thought the object might have been a gun, he could not say it was definitely a gun. He did recall it was "something shiny." The pistol used in the shooting was silver colored.

When the Defendant went back over to where the fight was going on, people started spreading out and some left the area. He saw Wiggins' car trying to leave, but the car started sliding. He saw the Defendant and Peck run up and start beating the glass windows on the driver's side of the car. Bean heard the

glass break, then in a minute saw a girl get out of the passenger's side of the car. He looked away for a minute, and when he looked back she was lying down in front of the car. The Defendant and Peck then drove off in the white Jeep. Bean went down when the police arrived and told them what he had seen.

Tommy Jurnett, patrolman with the Metropolitan Nashville Police Department, received a call to go to the scene at the Econo Lodge on January 19, 1994. When he pulled into the parking lot at the motel, there were a lot of people gathered around one location at the foot of the hill. He could see a white female lying on the ice, but from his own initial observations could not tell if she had been shot because he could not see any blood. Because she was not moving, he knew something was wrong and said she appeared to be dead. As soon as the ambulance arrived, he began to talk to those who had observed the fight and the shooting. Several people yelled that a white male on the second level was "him," meaning the one that had shot the victim. Jurnett saw that individual and was able to identify him as the Defendant.

Sergeant Robert Nash, also of the Metro Police Department of Nashville, was the patrol sergeant on January 19, 1994. He arrived at the Econo Lodge Motel around 10:30 p.m. that evening, and Officers Tommy Jurnett and Ralph Key were already on the scene. Nash helped to secure the scene, then learned that a potential suspect, the Defendant, was staying in a room on the second floor of the motel. Defendant was taken into custody after one of the female subjects at the scene identified him as being involved in the shooting.

Officer Brad Corcoran of the Metro Police Department arrived at the crime scene in time to see the victim's body being removed. He photographed the area and the various cars involved, then identified these photographs at trial. Corcoran identified a photo of a shell casing from a .380 semi-automatic handgun that was found inside the seat of Wiggins' car. A .380 caliber semi-automatic handgun was found at the fence line beside a tree on the back side of the motel. Three live rounds were also found near the weapon.

Dr. Ann Bucholtz, the forensic pathologist for Davidson County, testified that she examined the findings from the medical examiner as to the cause of death of Jennifer Jones. She stated that the gunshot wound entered the victim's chest on the left upper portion, near the armpit, passing into the chest cavity itself. The bullet then lacerated the left lung, heart, diaphragm and the liver tissue. The bullet was recovered during the autopsy.

The Defendant rested without offering any proof. The jury found Defendant guilty of the felony murder of Jennifer Jones and attempt to commit premeditated first degree murder of Brian Wiggins.

The Defendant argues that the evidence is insufficient as a matter of law to allow a rational trier of fact to conclude that he was guilty of the premeditated attempted murder of the victim. Therefore, he contends that if he is not guilty of the premeditated attempted murder, then he cannot be guilty of the underlying felony murder of the victim. At the time of these offenses, the law defined first-degree murder as an intentional, premeditated and deliberate killing of another or a reckless killing of another committed in the perpetration of, or attempt to

perpetrate any first degree murder. Tenn. Code Ann. § 39-13-202(a)(1) and (2). "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(2) and (3).

In order to hold the Defendant criminally responsible for first degree murder based upon the actions of Peck, the State must prove that, acting with the intent to promote or assist the commission of the offense, Defendant solicited, directed, aided or attempted to aid Peck in the killing of Brian Wiggins. Tenn. Code Ann. § 39-11-402(2). An aider and abettor under this statute can be held criminally responsible not only for the criminal offense aided or abetted, but also for any other crime committed by an accomplice as a "natural and probable consequence of the crime originally aided and abetted." State v. Carson, 950 S.W.2d 951, 952 (Tenn. 1997). The court in Carson described "natural and probable consequence" as "harms [the aiders and abettors] have naturally, probably and foreseeably put in motion . . . A 'natural and probable consequence' in the 'ordinary course of things' presupposes an outcome within a reasonably predictable range." Id. at 955 (citations omitted). In dicta, the supreme court also declared that the "[natural and probable consequences] principle also has been applied to accomplices under the felony murder doctrine." Id. at 955, n. 5. Also, the killing must not be independent or separate from the underlying felony. State

v. Severs, 759 S.W.2d 935, 938 (Tenn. Crim. App. 1988); Farmer v. State, 296 S.W.2d 879, 883 (Tenn. 1956).

Defendant argues that the evidence does not support a finding that he acted with the requisite intent, or shared intent, of the co-Defendant William Peck. While a defendant's intent to kill and his premeditation may be formed in an instant for the commission of first degree murder, "deliberation requires some period of reflection, during which the mind is free from the influence of excitement or passion." State v. Brown, 836 S.W.2d 530, 540 (Tenn. 1992) (citations omitted). "In order to establish first degree murder, the premeditated killing must also have been done deliberately, that is, with coolness and reflection. Id. at 539. Premeditation requires a "previously formed design or intent to kill." State v. West, 844 S.W.2d 144, 147 (Tenn. 1992).

The evidence shows that prior to the shooting, the Defendant came into the motel room and asked Peck for the gun. The two argued about who would have possession of the gun. After Wiggins arrived, the Defendant and Peck immediately ran outside with the gun and began to argue with him. Several witnesses observed the Defendant and Peck beating Wiggins. James Bean testified that he saw the Defendant go over to a white car and get something out from under the passenger's seat. Bean saw the Defendant show the object to the crowd and that was when people started leaving the scene. Bean stated that he thought the object was a gun. Wiggins testified that when he attempted to leave the motel in his car, that Peck and the Defendant were kicking the side of his car and were trying to hit him. While they were still fighting with Wiggins,

-13-

Defendant told Peck to "Blast him. Blast him." Immediately afterwards, the glass window was busted and the victim was shot.

Although the jury may not engage in speculation, the jury may infer premeditation and deliberation from the circumstances surrounding the killing, or, as in the instant case, the attempted killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995); State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993). Defendant abandoned the scene of the argument and walked back to his car to get a handgun. A rational trier of fact could reasonably infer from the proof that Defendant left the scene, went to his car and returned with the gun and the intention of shooting Wiggins. See State v. Wesemann, No. 03C01-9404-CR-00144, slip op. at 9, Sullivan County (Tenn. Crim. App., at Knoxville, June 25, 1997) (Rule 11 application filed August 18, 1997). During this time, Defendant certainly had the opportunity for premeditation and deliberation. We can infer premeditation from their use of a deadly weapon upon an unarmed victim. Brown, 836 S.W.2d 541. Furthermore, the Defendant and Peck, after first beating Wiggins, again attempted to stop Wiggins from leaving the scene of the argument. Armed with a handgun, they kicked his car, busted out the window, then shot into the vehicle. The bullet missed Wiggins but struck and killed Jennifer Jones, who was in the front seat between Wiggins and Juan Rosa. After viewing the evidence in the light most favorable to the State, the evidence was sufficient for a jury to have concluded that Defendant, for himself and as aider of Peck, acted with premeditated and deliberated intent to kill. See State v. Burlison, 868 S.W.2d 713, 718 (Tenn. Crim. App. 1993).

During oral arguments, Defendant's counsel noted that his conviction for attempted first degree murder was void in light of our supreme court's holding in State v. Kimbrough, 924 S.W.2d 888 (Tenn. 1996). The supreme court in Kimbrough held that there is not an offense of attempted felony murder as one cannot intend to accomplish the unintended. Id. at 892. Kimbrough is distinguished from this case as Defendant was convicted of attempted premeditated first degree murder of Brian Wiggins. This issue is without merit.

JURY INSTRUCTIONS

The Defendant argues that the trial court erred by failing to instruct the jury that only first degree murder could be considered as an underlying and predicate offense for the felony murder charge. Defendant admits that there was no objection to the jury charge and this issue was not raised in his motion for new trial. Defendant contends that the jury charge rises to the level of plain error.

The Defendant specifically objects to the language of the following portion of the trial judge's instruction to the jury:

> Any person who commits first degree murder is guilty of a crime. For you to find the defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> (1)    that on January 19, 1994, James Fernandez unlawfully killed Jennifer Jones, the alleged victim, and
>
> (2)    that the killing was committed in the perpetration of or the attempt to perpetrate the alleged homicide of Brian Wiggins; that is, that the killing was closely connected to the alleged attempt to kill Brian Wiggins, and was not a separate, distinct and independent event, and
>
> (3)    that James Fernandez intended to commit the alleged attempted homicide of Brian Wiggins; and

(4)    that the killing was a result of a reckless act by James Fernandez.
(emphasis added).

We first note that the Defendant did not object at the time the judge gave the jury this instruction, nor did he include this issue in his motion for new trial. Issues regarding the form or fullness of jury instructions are ordinarily not appropriate for appellate review and are deemed to be waived. State v. Cravens, 764 S.W.2d 754, 756-57 (Tenn. 1989).   Defendant's counsel was given opportunity to review the jury instructions prior to the charge to the jury and failed to object prior to that charge.   However, "the failure to make objection [to the content of an instruction given] shall not prejudice the right of a party to assign the basis of the objection as error in support of a motion for a new trial." Tenn. R. Crim. P. 30(b).   At the very least, the Defendant's failure to include the issue in his motion for a new trial is waiver of that issue, unless as Defendant argues, the jury instruction contains plain error.

Upon review of the entire set of jury instructions charged to the jury by the trial court, we see nothing that affected the substantial rights of the Defendant. Tenn. R. Crim. P. 52(b).   When reviewing the entire charge, we may only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law. In re Estate of Elam, 738 S.W.2d 169, 174 (Tenn. 1987).   During the charge to the jury on Count 1, the attempt to commit first degree murder, the trial court explained to the jury in detail the elements of first degree murder and the requirements of both premeditation and deliberation.   The trial court stated as follows:

> For you [the jury] to find the Defendant guilty of criminal attempt, the State must have proven beyond a reasonable doubt the existence

of the following essential elements: 1) that the Defendant intended to commit the specific offense of premeditated first degree murder on January 19, 1994, against the alleged victim, Brian Wiggins; and 2) that the Defendant did some act intending to cause an essential element of premeditated first degree murder to occur, and at the time believed that act would cause the element to occur without further action on the Defendant's part.

The essential elements necessary to constitute premeditated first degree murder are: 1) that a defendant unlawful[ly] [sic] kills an alleged victim; and 2) that the killing is intentional; and 3) that the killing is deliberate, and 4) that the killing is premeditated.

The trial court further explained the definitions of "intentional," "premeditated" and "deliberate." The trial court in Count 3 of the charge to the jury spoke of the "attempt to perpetrate the alleged homicide of Brian Wiggins" when referring to the underlying felony. A fair reading of the instructions reveals that the reference to the attempted homicide of Brian Wiggins specifically related to the earlier jury instruction regarding the attempt to commit premeditated first degree murder of Brian Wiggins as charged in Count 1 of the indictment. Jury instructions must be reviewed in the context of the overall charge rather than in isolation. State v. Byrd, No. 02C01-9508-CR-00232, slip op. at 32, Shelby County (Tenn. Crim. App., at Jackson, Dec. 30, 1996), perm. to appeal denied (Tenn. 1997) (citing Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979)); see State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). When viewed in the context of the overall charge, the trial judge's use of the word "homicide" rather than "first degree murder" did not serve to mislead the jury such that a substantial right of the Defendant was affected.

While we agree the more appropriate wording would have been "first degree murder" rather than "alleged homicide," any error which might have been made was at most harmless error. The jury found the Defendant guilty of attempt

-17-

to commit premeditated first degree murder, and the felony murder conviction was as a result of that attempt. This issue has no merit.

## MOTION FOR JUDGMENT OF ACQUITTAL

The Defendant argues that the trial court erred in overruling his motion for a judgment of acquittal. The duty of a trial judge and the reviewing court on appeal on the determination of a motion for a judgment of acquittal is the same as for a motion for a directed verdict. This duty is as follows:

> The rule for determining a motion for a directed verdict requires the trial judge and the reviewing court on appeal to look at all of the evidence, to take the strongest legitimate view of it in favor of the opponent of the motion, and to allow all reasonable inferences from it in his favor; to discard all countervailing evidence, and if then, there is any dispute as to any material determinative evidence, or any doubt as to the conclusion to be drawn from the whole evidence, the motion must be denied.

Jones v. State, 533 S.W.2d 326, 329 (Tenn. Crim. App. 1975); see also State v. Stowe, 634 S.W.2d 674, 675 (Tenn. Crim. App. 1982) (citations omitted). Just as there was sufficient evidence for a rational trier of fact to find the Defendant guilty of attempt to commit first degree murder and the felony murder, there was more than sufficient evidence for the trial court to overrule Defendant's motion for a judgment of acquittal. This issue is without merit.

## CONSECUTIVE SENTENCING

Defendant argues that the trial court erred in imposing consecutive sentences. At the sentencing hearing, the trial court imposed an eighteen (18) year sentence for the conviction of attempt to commit first degree murder and a

-18-

life sentence for the charge of felony murder.  The eighteen (18) year sentence is to be served consecutively to Defendant's life sentence.  Defendant does not contest the length of the eighteen (18) year sentence, only its consecutive manner of service.

When an accused challenges the length, range or the manner of service of a sentence, this court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d).  This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In conducting a de novo review of a sentence, this court must consider: (a) the evidence, if any, received at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement that the defendant made on his own behalf; and (g) the potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-102, -103, and -210; see State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

If our review reflects that the trial court followed the statutory sentencing procedure, imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and made findings of fact adequately supported by the record, then we may not

modify the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

The trial court based the imposition of consecutive sentences on the provisions of Tennessee Code Annotated section 40-35-115(b)(4). Under this provision, the Defendant was subject to consecutive sentences as a dangerous offender. Furthermore, the trial court found the following enhancement factors applicable: the Defendant's prior history of criminal convictions or behavior; his previous history of unwillingness to comply with the conditions of a sentence involving release into the community; his use or possession of a firearm; his lack of hesitation about committing a crime when the risk to human life was high; the potential for bodily injury to a victim was great; and the Defendant was on bail from a prior felony when the offense was committed. Tenn. Code Ann. § 40-35-114 (1), (8), (9), (10), (13) and (16).

In finding the Defendant to be a dangerous offender, the trial court must also have found that the Defendant's behavior indicates little or no regard for human life and, no hesitation about committing a crime in which the risk to human life is high. Tenn. Code Ann. § 40-35-115(b)(4). Furthermore, confinement for an extended period must be found as necessary to protect the public against further criminal conduct by the Defendant, and the consecutive sentences must reasonably relate to the severity of the offenses committed. State v. Wilkerson, 905 S.W.2d 933, 938-39 (Tenn. 1995). The trial court reasoned as follows:

> I've gone beyond, in the consideration, I've gone beyond just the fact that by the nature of these offenses, obviously, they involve a danger to other individuals. The trial judge is to go beyond that. I've gone beyond the fact that there was no hesitation in committing the crimes, and that the potential for bodily injury was great. I have

specifically considered that the terms imposed must be reasonably related to the severity of the offenses that were committed. I think it is imperative, given the extreme severity of these offenses, the extreme seriousness of the crimes, it is imperative that they carry independent sentences, and, secondly, in conjunction with that, I've considered that a significant term of incarceration is necessary to protect the public from further, similar criminal activity on the part of the defendant, so those are the bases for the consecutive sentencing determination.

From our review of the sentencing hearing and the entire record, the Defendant in the case sub judice is a dangerous offender and there was a sufficient basis on which to impose consecutive sentences. When Defendant brought the gun over to the scene of the argument, this evidenced his lack of hesitation in creating a high risk of death or serious bodily injury to all those involved in the argument, particularly in light of the fact that most of those same people had been drinking alcoholic beverages and were potentially intoxicated. The Defendant's conduct in this case demonstrated an indifference to the probability that someone in Brian Wiggins' vehicle would be killed if Peck chose to follow his instructions to "Blast him. Blast him." Other persons in addition to the victims were put at great risk. The nature of the two offenses Defendant committed are severe. Finally, an extended sentence is necessary to protect the public against the Defendant's further criminal conduct. At the time of these offenses, the Defendant was already on bond from a felony offense committed in Florida. His prior criminal record and the nature of these offenses prove that there is a need to confine the Defendant, particularly in light of his statement to the police in which he fails to demonstrate any remorse for his actions. See Wilkerson, 905 S.W.2d at 937-39. This issue has no merit.

Based upon our review of the record, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, Judge


CONCUR:


_____
GARY R. WADE, Judge


_____
J. CURWOOD WITT, JR., Judge