**IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE**

**AT JACKSON**

**SEPTEMBER SESSION, 1998**



**FILED**

**December 10, 1998**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | **)** | **C.C.A. NO. 02C01-9708-CC-00325** |
| | **)** | |
| Appellee, | **)** | |
| | **)** | |
| | **)** | **HAYWOOD COUNTY** |
| **VS.** | **)** | |
| | **)** | **HON. DICK JERMAN, JR.** |
| **RATHAL PERKINS,** | **)** | **JUDGE** |
| | **)** | |
| Appellant. | **)** | (First Degree Murder) |

**ON APPEAL FROM THE JUDGMENT OF THE**
**CRIMINAL COURT OF HAYWOOD COUNTY**

FOR THE APPELLANT:

CLIFFORD K. McGOWN, JR.
113 North Court Square
P.O. Box 26
Waverly, TN 37185

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

CLINTON J. MORGAN
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243

CLAYBURN L. PEEPLES
District Attorney General
109 East First Street
Trenton, TN 38382

OPINION FILED _____

AFFIRMED

DAVID H. WELLES, JUDGE

# **OPINION**

The Defendant, Rathal Perkins, was convicted of first degree murder and sentenced to life imprisonment. He now appeals his conviction, pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure. The Defendant presents only one issue on appeal: whether the evidence is sufficient to support a finding of premeditation to sustain his conviction for first degree murder. We affirm the judgment of the trial court.

On August 10, 1995, police officer Shawn Williams was dispatched to a field in Brownsville, Tennessee to investigate what he believed was an automobile accident with injuries. When he arrived at the field, he encountered a greatly upset young man named Courtney Jones and discovered a vehicle with a shattered back window. The officer noticed a man's leg hanging out of the driver's side of the vehicle and upon further investigation, recognized the man inside the car as Denoatus Murphy, the victim in this case.[1] The victim, who had a gunshot wound in his side, was vomiting and unable to speak. Another police officer arrived shortly after Officer Williams, and the two officers placed the victim on the ground and administered CPR to him until an ambulance arrived. The victim was then taken to the hospital, where he was pronounced dead.

At the hospital and briefly while the victim was in the car, Officer Williams had the opportunity to observe the victim's injuries, which he described as an entrance wound on the victim's right side and an exit wound on his left side. He also examined the victim's car and searched the field where it was found.

---

[1] The officer was acquainted with Murphy before the night of the murder.

Although the officer found a bullet lodged in the driver's seat and a .380 caliber shell casing in the back floorboard on the driver's side, he did not find any type of weapon in or around the vehicle. The officer also noted a stain on the driver's seat that appeared to be blood.

Rathal Perkins, the Defendant, was implicated by a number of witnesses as the shooter. At trial, the Defendant testified and admitted to shooting the victim. However, other facts surrounding the incident are in dispute.

Courtney Jones, the victim's cousin, testified that on August 10, 1995, the victim picked him up and they drove to a convenience store in Brownsville called The Marketplace, where they arrived around eight o'clock p.m. When they arrived at the store, the victim told his cousin he was there to look for Rodney Johnson, for whom the victim had recently signed a criminal warrant.[2] Mr. Johnson arrived shortly after the victim and pulled his car alongside the driver's side of the victim's car. He and the victim began to discuss the warrant. During this discussion, the Defendant pulled his vehicle alongside the passenger side of the victim's car.

At this point, the testimony of those present at The Marketplace that night differs markedly. Courtney Jones testified as follows: When the Defendant pulled alongside the victim's car, the victim "asked [the Defendant] what was the problem," to which the Defendant responded, "I'm with my nigger." By this, the Defendant apparently meant that he was there to side with his friend, Rodney

---

[2] The warrant, which was for aggravated assault, also covered Tracy Taylor, apparently a friend of Rodney Johnson. It alleged that Rodney Johnson had fired a gun at the victim.

Johnson. Johnson told the victim to ignore the Defendant, and words were exchanged.[3]

At Johnson's suggestion, Johnson and the victim moved their cars across the parking lot; the Defendant followed. Johnson and the victim resumed their discussion. Again, the victim asked the Defendant, "What's the problem. . . . [W]hy are you bothering me?" This time the Defendant jumped out of his car holding a gun, saying, "What? What'd you say? What?" He pushed Jones, who was sitting in the passenger seat of the victim's car, out of the way and shot into the victim's car, striking the victim in the side. The victim immediately started his car and sped away while the Defendant kept firing at the car, shattering the car's rear windshield. The victim eventually passed out and lost control of the car, and Jones took control of the vehicle, steering it into the field where the vehicle and the victim were found by Officer Williams.

Katanya Smith, a teenager who was at The Marketplace at the time of the shooting, testified that she heard a gunshot while sitting in her parked car just outside of the store. She then turned and saw a man, whom she could not identify, standing outside a car shooting. The car pulled away, and the man shot twice more. The man's car had been parked next to that of the victim.

Witnesses for the defense presented an entirely different version of the events on the night that the victim was killed. Julius Wynder, a friend of the Defendant from Memphis, testified that he was riding in the backseat of the

---

[3] It is unclear from Jones' testimony whether the victim exchanged words with Johnson or the Defendant. However, other witnesses testified that the victim and the Defendant argued on the night of the shooting.

Defendant's car on the night of August 10, 1995. He testified that when the Defendant arrived at The Marketplace and pulled alongside the victim's car, the victim[4] said to the Defendant, "What are you in our conversation for? . . . Man, you ain't even in this thing." Wynder testified that this "shocked" the Defendant, who had not provoked the victim. He further testified that when the three cars moved to the other side of the parking lot, the victim said to the Defendant, "Man, I- I'll blast your ass" and leaned down as if to grab something under the seat, presumably a gun. Wynder then testified that when the victim "went for the gun," Wynder dropped to the floorboard, heard two shots and then heard the Defendant get back into the car before the Defendant drove out of the parking lot. He did not see the gun for which he believed the victim reached and did not know who fired the shots that he heard. He never spoke with police about the incident, claiming that he was not aware at the time of the shooting that anyone had been shot and that he did not know he was involved in the investigation.

David Woods, who was evidently the front-seat passenger in the Defendant's car on the night of the murder, presented a similar story. He testified that the victim had threatened to "blast" the Defendant, to which the Defendant responded, "Don't reach for your gun." He claimed that the victim then reached under his seat, and Woods saw the victim's right hand coming up holding a gun as Woods ducked down. Like Wynder, Woods testified that he never saw shots fired, but unlike Wynder, he testified that he and Wynder discussed the fact that "the boy had died."

---

[4] Wynder used the term "dude" throughout his testimony and never specifically identified the person to whom he referred as the victim, although at one point Wynder did call the person "[t]he dude that's dead right now." Based upon his testimony as a whole and the other facts of this case, it is clear that by "dude," Wynder meant the victim.

Rodney Johnson, the man with whom the victim met on August 10, 1995, testified that the victim initiated the confrontation with the Defendant. He testified that he heard two or three shots fired. However, he stated that he never saw a gun, that he did not know who fired the shots, and that he did not know anyone had been hit.

At trial, the Defendant claimed that he shot the victim in self-defense. He testified that the victim told him, "I'll blow your ass off." According to the Defendant, as the victim reached down and came up with a gun, "I jumped out running fearing for my life shooting. . . . It wasn't intentional. . . . I wasn't trying to kill him. I didn't even know I hit him." The Defendant also admitted that his gun was a .380 caliber pistol and that he threw it away after the shooting.

After the murder, the police searched the parking lot of The Marketplace. They were unable to find any weapons, but they did find two spent shell casings beside the gas pumps which appeared to match the casing found in the victim's car. There was also a large amount of vehicle glass scattered in the parking lot. It appeared to stem from the area where the casings were found, near the gas pumps, and extended onto the street.

The State presents the threshold issue of whether this Court should waive the Defendant's untimely filing of the notice of appeal and accept the appeal of this case. The case contains a rather lengthy and unusual procedural history. The trial took place on November 9, 1995. The Defendant filed a Motion for New Trial on December 7, 1995; a hearing on the motion was held, and the motion was overruled on May 13, 1996. Trial counsel for the Defendant withdrew on

June 3, 1996. The Defendant, evidently fearing the loss of his right to appeal, filed some pro se documents, including a Motion for Leave to File Belated Notice of Appeal, a Petition for Post-Conviction Relief, and a Motion to Appoint Counsel for Appeal.[5] The Public Defender was appointed to represent the Defendant on August 22, 1997; on that same day, the Defendant filed a Notice of Appeal from the final judgment entered on December 12, 1995 and from the order of May 13, 1996 denying the Defendant a new trial.[6] A Notice of Appeal was filed in the Court of Criminal Appeals on August 29, 1997. Subsequently, due to a conflict of interest, the Public Defender withdrew from the case; and on October 13, 1997, substitute counsel Clifford McGown was appointed to represent the Defendant on appeal. The Defendant, through appointed counsel, filed an Amended Motion for New Trial on December 1, 1997, which was denied on January 5, 1998. On January 8, 1998, the Defendant then filed a Notice of Appeal from the final judgment entered on December 12, 1995 and from the order entered on January 5, 1998 denying the Defendant a new trial.

Rule 4 of the Tennessee Rules of Appellate Procedure states that

[i]n an appeal as of right to the . . . Court of Criminal Appeals, the notice of appeal required by Rule 3 shall be filed with and received by the clerk of the trial court within 30 days after the date of entry of the judgment appealed from; however, in all criminal cases the "notice of appeal" document is not jurisdictional and the filing of such document may be waived in the interest of justice. The appropriate appellate court shall be the court that determines whether such a waiver is in the interest of justice.

---

[5] Two of the three pro se documents contained in the record are unsigned. The Defendant, through present counsel, Clifford McGown, later moved the trial court to dismiss his Petition for Post-Conviction Relief as having been mistakenly and untimely filed. The trial court dismissed the petition on January 5, 1998.

[6] The actual Notice of Appeal incorrectly states that the order denying the Defendant a new trial was entered on May 31, 1996.

Tenn. R. App. P. 4(a). Due to the unusual circumstances in this case, we waive the untimely filing of the notice of appeal in the interest of justice. We will therefore proceed to discuss this case on the merits.

The Defendant argues that the proof presented by the State is insufficient to sustain the Defendant's conviction for first degree murder. He contends that the State failed to adequately prove the element of premeditation. He argues that the Defendant's conviction for first degree murder should therefore be modified to a conviction for second degree murder.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[findings] of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact beyond a reasonable doubt." Tenn. R. App. P. 13(e). "Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this Court." State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987) (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973)). Nor may this Court re-weigh or re-evaluate the evidence in the record below. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992) (citing State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978)).

A jury verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. Grace, 493 S.W.2d at 476 (citing State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983)). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences

therefrom. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982) (citing Cabbage, 571 S.W.2d at 835). Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also Evans, 838 S.W.2d at 191 (citing Grace, 493 S.W.2d at 476); Tuggle, 639 S.W.2d at 914.

Tennessee Code Annotated § 39-13-202 defines first degree murder as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1).[7] Premeditation is defined as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d). "'Premeditation' is the process simply of thinking about a proposed killing before engaging in the homicidal conduct . . . ," State v. Brown, 836 S.W.2d 530, 540-41 (Tenn. 1992) (quoting C. Torcia, Wharton's Criminal Law § 140 (14th ed. 1979)).

Premeditation is a question of fact to be resolved by the jury. State v. Anderson, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992). "As is usually the case, a determination of a culpable mental state, such as premeditation, must be

---

[7] Tennessee Code Annotated § 39-13-202 also presents two other types of first degree murder which are not at issue in the present case. See Tenn. Code Ann. § 39-13-202 (a)(2)-(3).

inferentially made from the circumstances surrounding the killing." State v. Burlison, 868 S.W.2d 713 (Tenn. Crim. App. 1993); see State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993). Thus, premeditation may be shown by circumstantial evidence. Brown, 836 S.W.2d at 541.

The following circumstances have been relied upon in Tennessee courts to prove premeditation: "(1) the victim was retreating or attempting to escape when shot; (2) the victim was unarmed and offered no provocation," State v. Martin, 702 S.W.2d 560, 562-63 (Tenn. 1985) (citations omitted), overruled on other grounds, Brown, 836 S.W.2d at 543; and (3) the victim "sustained repeated blows or shots." Houston v. State, 593 S.W.2d 267, 273 (Tenn. 1980), overruled on other grounds, Brown, 836 S.W.2d at 543.[8] The procurement or use of a deadly weapon may also be relevant to the question of premeditation. State v. Bush, 942 S.W.2d 489, 501 (Tenn. 1997); Burlison, 868 S.W.2d at 718; see Brown, 836 S.W.2d at 541.[9]

---

[8]    In Houston v. State . . . the only circumstance relied upon by the majority to establish premeditation and deliberation was the fact that the victim had sustained "repeated shots or blows" . . . Logically, of course, the fact that repeated blows (or shots) were inflicted on the victim is not sufficient, by itself, to establish first-degree murder. Repeated blows can be delivered in the heat of passion, with no design or reflection. Only if such blows are inflicted as the result of premeditation and deliberation can they be said to prove first-degree murder. . . . Certainly, more than the mere fact of "repeated blows" must be shown to establish first-degree murder, and to the extent that the opinions in Houston and Martin can be read to hold otherwise, they are expressly overruled.

Brown, 836 S.W.2d at 542, 543 (citations omitted). We read this to mean that repeated shots, standing alone, are not sufficient to support a finding of premeditation; however repeated shots may be considered in conjunction with other circumstances to support a finding of premeditation. We note incidentally that the requirement of deliberation is now abolished under our current first degree murder statute. See Tenn. Code Ann. § 39-13-202.

[9]    Specifically, our supreme court stated in State v. Brown that "[r]elevant circumstances recognized by other courts around the country have included the fact 'that a deadly weapon was used upon an unarmed victim; [and] . . . that weapons with which to commit the homicide were procured . . . .'" Brown, 836 S.W.2d at 541 (emphasis added).

We will now review the facts of the case before us. The Defendant arrived at the scene of the crime with a gun in his vehicle. His purpose was apparently to assist his friend who was involved in a dispute with the victim. He got out of his vehicle holding his gun. He shot at least two times into or at the victim's car and fired at least one of those shots at the victim's car as the victim sped away. In addition, police could find no weapon which belonged to the victim at the crime scene, in the victim's car, or in the field where the victim was discovered. Whether these facts show premeditation is a classic question of fact for consideration by the jury. Upon review of the testimony presented at trial, the jury evidently concluded that the testimony of the Defendant and other witnesses for the defense was dubious. We will not disturb this conclusion on appeal. We believe that the evidence presented to the jury was sufficient to support a finding of premeditation.

The judgment of the trial court is accordingly affirmed.


_____
DAVID H. WELLES, JUDGE


CONCUR:


_____
PAUL G. SUMMERS, JUDGE


_____
JOE G. RILEY, JUDGE