# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### FEBRUARY 1999 SESSION



**FILED**

**July 23, 1999**

**Cecil W. Crowson**
**Appellate Court Clerk**

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | * | C.C.A. # 01C01-9708-CC-00339 |
| Appellee, | * | Montgomery County |
| VS. | * | Honorable Robert W. Wedemeyer, Judge |
| **CEDRIC PHELPS,** | * | (First Degree Murder–Life) |
| Appellant. | * | |

FOR THE APPELLANT:

STACY A. TURNER
105 South Third Street
Clarksville, TN 37040

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General & Reporter

KAREN M. YACUZZO
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243

JOHN WESLEY CARNEY, JR.
District Attorney General

DANIEL BROLLIER
Assistant District Attorney General
204 Franklin Street, Suite 200
Clarksville, TN 37040

OPINION FILED: _____

**AFFIRMED**

**JOHN EVERETT WILLIAMS,**
Judge

# OPINION

The defendant, Cedric Phelps, was convicted of first degree murder in the perpetration of aggravated child abuse, see Tenn. Code Ann. §§ 39-13-202; 39-15-402, and sentenced to life in prison. He appeals, arguing that the trial court erroneously admitted certain prejudicial testimony and that the evidence at trial was insufficient to support the jury's verdict of guilt. We affirm the judgment of the trial court.

## BACKGROUND

Sometime during the early morning of June 17, 1995, the defendant's daughter, twenty-five-day-old Lichelle Phelps, suffered an injury to her head from which she died a few hours later. The defendant's wife, Tiffany Phelps, testified that she attended the child at approximately 3:00 a.m. and that she was alive and well at that time. Ms. Phelps then left the child in the defendant's care and retired to another room for the remainder of the morning.

The defendant stayed with the child in the couple's living room and slept. He testified that he woke at approximately 7:00 a.m. and noticed that the child was pale and turning blue. The defendant stated that he attempted to check for a pulse and then woke his wife who called for an ambulance. When the ambulance arrived, the child was warm and limp but had no heart beat and was not breathing. The emergency medical personnel began performing cardiopulmonary resuscitation and transported the child to the emergency room of Blanchfield Army Hospital at Fort Campbell. There, Dr. Scott Rice unsuccessfully continued attempts to resuscitate her. She was pronounced dead at 8:05 a.m.

During his initial examination of the victim, Dr. Rice noticed an area of swelling on the right side of her head. This discovery prompted him to order x-

rays of her head. These x-rays revealed a broadly separated fracture of the child's skull. Dr. Rice then ordered further skeletal x-rays, which revealed multiple additional injuries.

Based on his own examination, as well as his review of the reports from two subsequent autopsies, Dr. Rice testified that the cause of the child's death was severe head trauma, which, he estimated, would have resulted in symptoms–"most likely totally unconscious"–that would have been immediately observable to a person with no medical training and would have caused her death within one to two hours. He opined that the fatal injury would have required a "very significant" or "severe amount of force." And, after describing each of the child's injuries and explaining in detail how each typically occurs, he opined that the injuries were intentionally inflicted rather than accidental.

Approximately fifteen hours after her death, Dr. Charles Harlan conducted an autopsy of the victim. Like Dr. Rice, Dr. Harlan testified that the cause of death was blunt trauma to the head and opined that the injury would have required a "major impact." Unlike Dr. Rice, however, Dr. Harlan opined that the head injury appeared accidental and estimated that the interval between injury and death would have been approximately twenty-four hours, with the child becoming symptomatic within twelve to eighteen hours of the injury.

On September 25, 1995, Dr. George R. Nichols, II conducted a second, post-exhumation autopsy of the victim and reviewed all previously conducted x-rays, examinations, and reports. Based on his findings, Dr. Nichols testified that the child had suffered the following injuries: a large complex right parietal skull fracture; a second, lineal or simple skull fracture; fractures of the left sixth and seventh ribs; a corner or metaphysis fracture of the right humerus; a periosteal hemorrhage on the right radius; and discoloration of the outer membrane of the

left tibia. With the exception of the last listed injury, which Dr. Nichols described as a therapeutic injury from the insertion of a needle into the bone, Dr. Nichols opined that all of these injuries were inflicted rather than accidental, thus clearly indicating child abuse. He further opined that all of the victim's injuries had occurred within one day of her death. He testified that the victim's head injuries resulted from multiple impacts with a "huge" amount of force and attributed the victim's immediate cause of death to brain injury. As for the time-line following injury, Dr. Nichols stated that the victim would have been symptomatic within a few minutes and would have died within an hour or less.

Three additional physicians evaluated the x-rays, autopsy photographs and reports, and other records of the victim and testified at the defendant's trial. Dr. Ellen Wright Clayton opined that the victim had died from repeated blows to the head, inflicted with "a great deal" of force. After extensively detailing the basis for her opinion, she further stated that the victim's injuries were not accidental. Dr. Clayton testified that head injuries like the victim's would typically cause symptoms and death within a few hours and, noting that the victim's brain had not yet started to swell at her death, she concluded that the victim had in fact died shortly after her injuries were inflicted.

Based on the presence of subdural hemorrhaging, Dr. Mary Case specifically identified the fatal head injury as a diffuse axonal injury (literally, the tearing away of the axonal processes that connect the nerve cells of the brain). She testified in detail how such injuries occur and opined that the victim's injuries were not accidental but inflicted. Dr. Case also testified that the fatal injury would have produced immediate unconsciousness and death in probably less than one hour.

Finally, Dr. Cleland Black opined that the cause of death was multiple inflicted trauma to body, head, and trunk. He testified that the victim would have exhibited severe symptoms very soon after the injuries to her head and could not have survived more than a few hours after the injuries.

In summary, five of the six medical experts who testified in this case opined that the victim's injuries were inflicted rather than accidental and that the victim would have died within minutes to a few hours after incurring her head injuries. Each of these five experts also testified that the victim would have been symptomatic almost immediately after the injury. These opinions, combined with Ms. Phelps testimony that the victim was fine when she saw and fed her at 3:00 a.m., support the state's theory that the victim's injuries were inflicted after 3:00 a.m., when the defendant had sole custody of the child. Dr. Harlan, the single expert whose opinion did not support the state's case as to the time line from injury to symptoms and death, testified that the victim would have become symptomatic within twelve to eighteen hours and would have died approximately twenty-four hours following her injuries. Dr. Harlan also contradicted the other five experts in his opinion that the victim's injuries appeared accidental.

## ANALYSIS

The defendant first argues that the trial court erred in allowing Doctors Rice and Clayton to offer their opinions as to the interval between the victim's injury and death. He asserts that because neither doctor is a forensic pathologist, they were not competent to testify as experts in this area.

The admissibility of expert testimony is a matter entrusted to the sound discretion of the trial court, and this Court will not disturb the trial court's decision

in that regard absent an abuse of that discretion.  See State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993).

We find no error in the trial court's admission of the contested testimony. Both doctors were qualified to state their medical opinions based on their experience and training.  Both are medical doctors.  Both specialize in pediatrics, and both have substantial experience treating children with severe head injuries. That neither is a forensic pathologist goes to the weight of their testimony, not its admissibility.  Further, we note that any hypothetical error in allowing this testimony would not be prejudicial, as their testimony regarding the interval between injury and death was consistent with, and cumulative to, that of doctors Nichols, Case, and Blake.

The defendant next argues that the evidence is insufficient to support the jury's finding of guilt.  When an appellant challenges the sufficiency of the evidence, this Court must determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e).  The appellee is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom.  See State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

The credibility of witnesses, the weight of their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the trier of fact.  See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993).  A jury verdict for the state accredits the testimony of the state's witnesses and resolves all conflicts in favor of the state.  See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983).

Moreover, a guilty verdict removes the presumption of innocence enjoyed by defendants at trial and replaces it with a presumption of guilt. <u>See</u> <u>State v. Grace</u>, 493 S.W.2d 474, 476 (Tenn. 1973). Thus, an appellant challenging the sufficiency of the evidence carries the burden of illustrating to this Court why the evidence is insufficient to support the verdict. <u>See</u> <u>State v. Freeman</u>, 943 S.W.2d 25, 29 (Tenn. Crim. App. 1996).

Based primarily on Dr. Harlan's testimony that death would not have occurred for approximately twenty-four hours after the victim's injuries, the defendant argues that the evidence does not establish that the victim's injuries occurred during his exclusive care and custody of the child. The undisputed evidence, including the defendant's own testimony, indicates that the defendant was solely responsible for the custody and welfare of the victim during the five hours immediately preceding her death. Further, five of six experts testified that the victim's injuries were intentionally inflicted and necessarily occurred within this five-hour period. Thus, the evidence supports the jury's conclusion that the victim died as the result of severe child abuse inflicted by the defendant during his exclusive custody of the child.

## CONCLUSION

The judgment of the trial court is AFFIRMED.

_____
JOHN EVERETT WILLIAMS, Judge

CONCUR:

_____
DAVID G. HAYES, Judge


_____
JAMES CURWOOD WITT, JR., Judge