IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 15, 2005 Session

## STATE OF TENNESSEE v. KELVIN JERMAINE DOWELL

**Appeal from the Circuit Court for Tipton County**
**No. 4910     Joseph H. Walker, Judge**

---

**No. W2005-00588-CCA-R3-CD  - Filed February 17, 2006**

---

The defendant, Kelvin Jermaine Dowell, was convicted by jury of first degree murder and abuse of a corpse, *see* Tenn. Code Ann. §§ 39-13-202(a)(1), -17-312 (2003), for which he received a life sentence. Aggrieved of his convictions, the defendant brings the instant appeal challenging the sufficiency of the evidence and the trial court's denial of his request for a continuance. After a thorough review of the record and applicable law, we affirm the judgments of the lower court.

**Tenn. R. App. P. 3; Judgments of the Circuit Court are Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and J.C. MCLIN, JJ., joined.

Gary F. Antrican, District Public Defender; and David S. Stockton, Assistant District Public Defender, for the Appellant, Kelvin Jermaine Dowell.

Paul G. Summers, Attorney General & Reporter; J. Ross Dyer, Assistant Attorney General; and Elizabeth T. Rice, District Attorney General, for the Appellee, State of Tennessee.

### OPINION

Because the jury's guilty verdict accredited the state's version of the evidence, we summarize the evidence in the light most favorable to the state. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994).

On April 28, 2004, James Russell, Jr. ("Junior"), Reggie "Pee Wee" Dowell, Jeff Mosley, Rafael Wakefield, Courtney "Tiny" Lemons and the defendant, were playing basketball in the Wilkinsville Trailer Park. At some point during the basketball game, the victim, Javier "Jay" Demarco Brookins, interrupted the basketball game and had a conversation with the defendant, who supplied the victim's crack cocaine. At the conclusion of the conversation, the victim returned to his trailer, and the defendant and the other basketball players followed the victim. Apparently, the victim had offered to sell his stereo to the defendant or give it to him as payment. When the victim

disappeared inside his trailer and did not re-emerge despite the defendant's demands that he do so, the defendant became angry and reported that he was "going to get" the victim.

The group then resumed their basketball game until the victim returned approximately 30 to 45 minutes later carrying either a broken golf club or a metal baseball bat. James Russell, Jr., who was armed with a pistol, met the victim and began yelling and waving his pistol at him. Mr. Russell then put his pistol away, and the victim and the defendant had a less-heated discussion. The victim then headed across a nearby field in the direction of his trailer with the defendant, Mr. Russell, and "Pee Wee" Dowell. Mr. Dowell overheard Mr. Russell tell the defendant "don't let him talk to y'all like that. Do that n-----." Mr. Russell then heard a gunshot and began to run from the field. As Mr. Russell looked over his shoulder, he saw the defendant standing in front of the victim, who was kneeling. Later, the defendant told Mr. Dowell that the victim "had lost his life over something stupid."

Rafael Wakefield, a fellow resident of the Wilkinsville Trailer Park, was walking to the defendant's trailer when he overheard Mr. Russell instruct the defendant to shoot the victim. Moments later, Mr. Wakefield heard gunshots and then saw Mr. Russell emerge unarmed from behind a trailer looking shocked and fearful. Seconds later, the defendant approached Mr. Wakefield and informed him that he needed to use his pick-up truck. Mr. Wakefield complied, and the defendant and Mr. Russell loaded the victim's body, which was wrapped in a black tarp, into the pick-up truck. Mr. Wakefield then drove to a landing by the Mississippi River where the group hoisted the victim over the guardrail, and the victim rolled into the Mississippi River. Thereafter, the group visited a car wash where they removed the victim's blood from Mr. Wakefield's vehicle.

Mr. Wakefield heard the victim snoring both when loading him into the pick-up truck and when dumping him into the Mississippi River. Additionally, the defendant told Mr. Dowell and Keith Russell that the victim was still breathing after he was shot. However, Medical Examiner Dr. Bruce Levy testified that he was unable to determine whether the victim died of drowning but opined that the victim's gunshot wounds were fatal and would have killed the victim regardless whether he was subsequently placed in a river. Doctor Levy further explained that the victim's snoring reflected his comatose state.

After the victim's body was discovered floating in the Mississippi River, the subsequent investigation and examination of the body revealed the victim's identity and residence in the Wilkinsville Trailer Park. The local police, assisted by Tennessee Bureau of Investigation Special Agent Donna Turner, canvassed the trailer park and interviewed all residents. Thereafter, investigators asked James Russell, Jr., Rafael Wakefield, and the defendant to come to the sheriff's office for questioning. They did so and gave sworn statements in which each individual confessed his role in the victim's murder and disposal of his body. Thereafter, all three were arrested and charged with abuse of a corpse, and the defendant was also charged with first degree murder. The state later dropped the charges against Mr. Russell and Mr. Wakefield in exchange for their trial testimony about the defendant's role in the victim's murder.

Despite his sworn statement in which the defendant admitted to shooting the victim when he believed the victim was going to hit him with the baseball bat he was carrying, the defendant later maintained his innocence, and his trial defense theory was that James Russell, Jr. had shot the victim.

*Sufficiency of the Evidence*

In his first issue on appeal, the defendant contends that the evidence is insufficient to support his conviction for first degree murder. Our consideration of that claim is grounded in legal bedrock. When an accused challenges the sufficiency of the evidence, an appellate court inspects the evidentiary landscape, including the direct and circumstantial contours, from the vantage point most agreeable to the prosecution. The reviewing court then decides whether the evidence and the inferences that flow therefrom permit any rational fact-finder to conclude beyond a reasonable doubt that the defendant is guilty of the charged crime. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Duncan*, 698 S.W.2d 63, 67 (Tenn. 1985); *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000).

In determining sufficiency of the proof, the appellate court does not replay and reweigh the evidence. *See State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Witness credibility, the weight and value of the evidence, and factual disputes are entrusted to the finder of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); *Farmer v. State*, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). Simply stated, the reviewing court will not substitute its judgment for that of the trier of fact. Instead, the court extends to the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences that may be drawn from the evidence. *See Cabbage*, 571 S.W.2d at 835.

With these principles in mind, we must determine whether the evidence in this record is sufficient to support the jury's verdict. We begin with the definition of the conviction offense. First degree murder is defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2003).

> Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time."

*Id.* § 39-13-202(d). Intentional "refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id.* § 39-11-302(a). The existence of premeditation is a question for the jury and may be inferred from the circumstances surrounding the killing. *See State*

*v. Rosa*, 996 S.W.2d 833, 837 (Tenn. Crim. App. 1999); *State v. Gentry*, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993).

The defendant argues that the evidence is insufficient to support his first degree murder conviction because the state's eyewitnesses testimony is riddled with inconsistencies and because their testimony and the defendant's statement reflect that the victim was armed and acting in a threatening manner when shot. In sum, the defendant argues that viewed in the light most favorable to the state, the evidence could only support a second degree murder conviction and that the state did not meet its burden of proving premeditation. The state counters that the evidence introduced at trial demonstrates that the defendant acted with premeditation; specifically, the defendant threatened the victim, led the victim to the murder scene where he shot the victim twice, calmly enlisted help to destroy evidence of the murder, and admitted that he shot the victim to friends.

We agree that the evidence introduced at trial supports the defendant's first degree murder conviction. First, we note that any alleged discrepancies in eye witness testimony do not undermine the sufficiency of the supporting evidence because the jury is the sole finder of fact and therefore is entrusted with resolving all factual disputes. The defendant's guilty verdict reflects that the jury resolved these factual discrepancies in favor of the state, and we will not reweigh or replay the evidence. *See Cabbage*, 571 S.W.2d at 835; *Liakas*, 199 Tenn. at 305, 286 S.W.2d at 859; *Farmer*, 574 S.W.2d at 51.

Next, we hold that the evidence introduced at trial formed a reasonable basis for the jury to conclude that the defendant acted with premeditation when shooting the victim. The state's evidence suggests that the defendant supplied crack cocaine to the victim and that on the day of his murder, the victim took the defendant's crack cocaine to his trailer, promising to bring his stereo out in payment for the drugs. However, the victim did not do so, which angered the defendant. Thereafter, the defendant remarked to his friends that he would "get" the victim. Later that day during a subsequent encounter, the defendant led the victim towards his trailer through a field. When James Russell, Jr., instructed the defendant to "kill that n-----," the defendant shot the victim using Mr. Russell's pistol. The defendant then fired a second shot when the victim was kneeling before him. Approximately thirty seconds later, the calm-demeanored defendant solicited the use of Rafael Wakefield's pick-up truck to dispose of the victim's body. While Mr. Wakefield walked to his truck and drove into the field where the victim was shot, the defendant wrapped the victim's snoring body in a tarp and loaded it into the back of Mr. Wakefield's truck. The defendant then instructed Mr. Wakefield to drive to the Mississippi River where he dumped the victim's still snoring body. The defendant then proceeded to destroy evidence of his crime by instructing Mr. Wakefield to drive to a car wash where he cleaned the victim's blood from the pick-up truck bed. Later, the defendant told others, including law enforcement officers, that he had shot the victim. We hold that this evidence sufficiently supports a finding that the defendant acted with cool purpose when shooting the victim. *See State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997) (noting that a defendant's calmness immediately after the killing can support a finding of premeditation).

*Motion for Continuance*

The defendant contends that the trial court erred by denying his motion to continue his trial date.  As the bases for his motion, the defendant cites the state's failure to provide (a) a codefendant's statement, (b) the exculpatory statement of Courtney Lemons who told investigators that he witnessed James Russell, Jr. shoot the victim, and (c) the state's expert witness's identity or copies of his report.  Additionally, the defendant complains that the court erroneously refused to continue the trial date to allow testing of James Russell. Jr.'s shoes for the presence of the victim's blood.

However, the defendant failed to include this issue in his motion for new trial and has accordingly waived it for consideration on appeal.  *See* Tenn. R. App. P. 3(e) (in jury cases, no error may be predicated upon the admission of evidence unless the claim "was specifically stated in a motion for new trial; otherwise such issue[ ] will be treated as waived").  Moreover, the defendant has failed to include a transcript of the continuance motion hearing in the appellate record, thereby hindering our review.  *See* Tenn. R. App. P. 24(b) (instructing that an appellant has the burden of preparing an adequate record for appellate review).  Finally, without the benefit of reviewing the hearing transcript, we see no basis for treating the claimed error as plain error.  *See* Tenn. R. Crim. P. 52(b) (allowing for plain error review when the record clearly establishes what occurred in the trial court).  Accordingly, this issue does not entitle the defendant to relief.

Because we hold that the defendant's issues do not merit relief, we accordingly affirm the judgments of the lower court.

_____
JAMES CURWOOD WITT, JR., JUDGE