STATE of Tennessee, Appellee,

v.

Wayman GENTRY, Appellant.

Court of Criminal Appeals of Tennessee,
at Knoxville.

Sept. 17, 1993.

Permission to Appeal Denied by
Supreme Court Jan. 3, 1994.

Joe H. Walker, Public Defender, 9th Judicial District and Alfred Lee Hathcock, Jr. and Bernard R. Sargent, Asst. Public Defenders, Lenoir City, for appellant.

Charles W. Burson, Atty. Gen. and Reporter, Ruth A. Thompson, Crim. Justice Div., Nashville, Charles E. Hawk, Dist. Atty. Gen., and Frank A. Harvey, Asst. Dist. Atty. Gen., Kingston, for State.

WADE, Judge.

## OPINION

The defendant, Wayman Gentry, was convicted of first degree murder and sentenced to a term of life in prison. The following issues are presented for appellate review:

(1) whether the evidence was sufficient to support a first degree murder conviction;

(2) whether the defendant's confession was properly admitted into evidence; and whether certain of the defendant's other pre-trial statements were properly introduced;

(3) whether the trial court properly instructed the jury on the issue of deliberation; and

(4) whether the trial court properly admitted, as relevant evidence, the testimony of Carolyn Scott and Linda Mason, witnesses for the state.

We find no prejudicial error and affirm the judgment of the trial court.

At the time of the offense, the defendant, single and 36 years of age, resided alone in a trailer on a Roane County farm owned by his father, Gilford Gentry. Apparently, the elder Gentry had worked for the Tennessee Valley Authority in years past and had gotten hurt, but was denied disability. There was testimony that Gilford Gentry, whose property was subject to a TVA utility easement, had harbored ill feelings towards the agency for years and that his son, the defendant, had similar feelings and lived in fear of losing the farm.

The victim, Charles Brewster, was employed by TVA to plan and coordinate the maintenance of easements and rights of way. As a part of his job responsibilities, the victim notified private property owners before the agency made any entry for the purpose of transmission line maintenance.

On August 9, 1991, the victim, aware of the Gentrys' antipathy toward the agency, asked James Droke to be a witness to his attempt to arrange maintenance work on the Gentry property which was located in a remote section of the Ten Mile community. When the victim and Droke arrived in their TVA vehicle, the defendant was at a neighboring garage in the accompaniment of Keith Walker, who worked at the garage with his father. When he saw the TVA vehicle enter the property, the defendant said, "There them SOB's are." Walker, who acknowledged that the defendant and his father "badmouthed the TVA all the time about something," testified that the defendant then stated that "it looked like that he would have to kill them." The defendant left the garage before the victim stopped for directions. When they inquired as to the defendant's whereabouts, Walker directed them "up the road." Within five minutes, Walker heard several gunshots from the area of the Gentry farm.

John Walker, Keith Walker's father, was also at the garage just before the shooting. He overheard the defendant say that he intended to kill anyone from TVA who came to his house. Neither of the Walkers took particular notice to the comments because the defendant had made similar statements in the past.

The defendant's attitude toward the agency was well known. Carolyn Scott, an employee with the Volunteer Electric Cooperative in Decatur, testified that she had heard him say more than once that "if any TVA

person stepped foot on his property he would blow them away." Lucille Mason, another employee of the utility cooperative, also testified that the defendant had threatened to kill any TVA employees who came on his property.

Neither Droke nor the victim was armed when they parked in the Gentry driveway. Droke testified that the victim approached the defendant, who stood near the barn carrying a rifle. Droke further testified as follows:

> Charles was there only to talk to him about the contractors would be coming through in a couple of weeks. He just wanted to let them know that they would be coming through.... Charles told him that we were with TVA and why we were there....

> \*   \*   \*   \*   \*   \*

> ... And then as he got right up close to him, Charles asked him, said what has created the problem between you and TVA and what can we do to solve that problem.

The defendant pointed to his left and told the victim he was "supposed to use that god damned road ... [t]hat god damned road right there." The defendant pointed the rifle to within three to four inches of the victim's face. When the victim pushed the barrel aside, the defendant immediately fired several shots. Droke, only a few feet away, turned and ran a few steps until he realized that the defendant was not going to fire at him. Before Droke could get to his vehicle, however, he heard a shout and another rifle shot. He saw the defendant with a rifle and hid near some cedar bushes. The defendant left and Droke went to a neighbor's where he contacted the authorities.

Deputy Jeff Clowers of the Roane County Sheriff's Department was the first to arrive at the scene. He found the defendant sitting in a swing with the rifle in his lap. Deputy Clowers drew his weapon and directed the defendant to drop his rifle. The defendant initially refused to part with his weapon but ultimately agreed to do so. The officer described the defendant as appearing calm. When asked what had occurred, the defendant replied, "I shot him. He's laying right up there."

Officer Darrell Sirmans, the Roane County Criminal Investigator, testified that the victim was dead when he arrived at the scene. He observed several bullet wounds in the body. Later, the defendant signed a waiver of rights form and acknowledged that he had a .22 automatic rifle in his possession when approached by the man from TVA. The defendant stated that he told the victim to leave but could recall nothing from that point until he was arrested by Deputy Clowers.

Officer Sirmans presented the confession into evidence. The defendant also made other incriminating statements during a question and answer interview.

An autopsy indicated that the body had five gunshot wounds. The victim died as the result of gunshot wounds to the head and chest.

## I

On appeal, the state is entitled to the strongest legitimate view of the evidence and all inferences which might be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn.1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the triers of fact. *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn.Crim.App. 1978). A conviction may be set aside only where the reviewing court finds that the "evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn.R.App.P. 13(e).

The defendant initially contends that the evidence is insufficient because the state failed to adequately prove the element of deliberation. *See* Tenn.Code Ann. § 39–13–202. He argues that he was overcome with passion in the commission of the crime and could not have adequately formed the requisite design and purpose to kill the victim.

Our court has held that the elements of premeditation and deliberation are questions for the jury and may be inferred from the manner and circumstances of the killing. There is no specific amount of time that

"must elapse between the formation of the intention to kill and the actual killing so as to establish premeditation." *State v. Browning*, 666 S.W.2d 80, 84 (Tenn.Crim.App.1983). More recently, our supreme court spoke on the subject in *State v. Brown*, 836 S.W.2d 530 (Tenn.1992). In that case, the court held that the record failed to establish that the state had met its burden of proof on the elements of deliberation and premeditation. The first degree murder conviction was modified to one of murder in the second degree and the case was remanded to the trial court for resentencing.

In *Brown*, our supreme court acknowledged that the Tennessee courts had often, but erroneously, commingled the elements of premeditation and deliberation:

> Hence, perhaps the two most oft-repeated propositions with regard to the law of first-degree murder, that the essential ingredient of first-degree murder is premeditation and that premeditation may be formed in an instant, are only partially accurate, because they are rarely quoted in context. In order to establish first-degree murder, the premeditated killing must also have been done deliberately, that is, with coolness and reflection. . . .

> \*  \*  \*  \*  \*  \*

> The obvious point to be drawn ... is that even if intent (or "purpose to kill") and premeditation ("design") may be formed in an instant, *deliberation requires some period of reflection, during which the mind is "free from the influence of excitement, or passion."*

*Brown*, 836 S.W.2d at 539–40 (emphasis added).

One treatise, cited in the *Brown* opinion, provides historical definitions:

> "Premeditation" is the process simply of thinking about a proposed killing before engaging in the homicidal conduct; and "deliberation" is the process of carefully weighing such matters as the wisdom of going ahead with the proposed killing, the manner in which the killing will be accomplished, and the consequences which may be visited upon the killer if and when apprehended. "Deliberation" is present if

the thinking, i.e., the "premeditation," is being done in such a cool mental state, under such circumstances, and for such a period of time as to permit a "careful weighing" of the proposed decision.

2 C. Torcia, *Wharton's Criminal Law*, § 140 (14th ed. 1979) (footnotes omitted).

Our statute describes "deliberate act" and "premeditated act" separately. Tenn.Code Ann. § 39–13–201(b)(1) and (2). The former is "one performed with a cool purpose," and the latter is "one done after the exercise of reflection and judgment." In *Brown*, the Supreme Court held that deliberation requires some time interval between the decision to kill and the act itself: "[I]t is now abundantly clear that the deliberation necessary to establish first degree murder *cannot* be formed in an instant." 836 S.W.2d at 543 (emphasis in original).

We interpret the holding to require proof that the offense was committed upon reflection, "without passion or provocation," and otherwise free from the influence of excitement. It is fundamental that once a homicide has been established, it is presumed to be second degree murder. *Witt v. State*, 46 Tenn. 5, 8 (1868). The state must prove both premeditation and deliberation in order to elevate the offense from second to first degree murder. *Bailey v. State*, 479 S.W.2d 829, 833 (Tenn.Crim.App.1972).

Deliberation is present when the circumstances suggest that the murderer reflected upon the manner and consequences of his act. In *State v. West*, 844 S.W.2d 144 (Tenn.1992), the supreme court held that although no specific time is required to form the requisite deliberation, "more than a 'split second' of reflection [is necessary] in order to satisfy the element[ ] of ... deliberation." *Id.* at 147.

Another treatise provides some insight to the nature of proof required before a jury might properly infer either deliberation or premeditation:

> (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, *planning activity;*

(2) facts about the defendant's prior relationship and conduct with the victim from which *motive* may be inferred; and

(3) facts about the *nature of the killing* from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

2 W. LaFave and A. Scott, *Substantive Criminal Law* § 7.7 (1986) (emphasis in original) (footnote omitted).

█ In this instance, the state proved that the defendant held a grudge against the Tennessee Valley Authority and its employees. For some time he had stated his intentions to kill TVA employees who came upon his property. On the date of the shooting, the defendant observed the TVA vehicle enter his land. He then returned to his residence, armed himself, and stood waiting near the barn for its arrival.

While the defendant may have been agitated by these circumstances, the proof was that his exterior demeanor was calm. There was eyewitness testimony that the victim had not been offensive during his exchange of conversation with the defendant. Nevertheless, the defendant pointed his gun in the face of the victim and, upon meeting minimal resistance to this threat, fired several shots at point blank range.

From these facts, a jury might have appropriately determined that the defendant planned the activity, had a motive, and ultimately killed the victim in accordance with his preconceived design. In consequence, we find that the proof was sufficient to establish the element of deliberation and to otherwise support the first degree murder conviction. The presence of agitation or even anger, in our view, does not necessarily mean that the murder could not have occurred with the requisite degree of deliberation.

## II

The defendant also asserts that the trial court erred by denying his motion to suppress not only his confession but other pretrial statements he made to the investigating officers. At the suppression hearing, the defendant claimed that he asked for counsel, did not sign his waiver of rights, and had no recollection of being apprised of his constitutional entitlements. The defendant explained that he had suffered a seizure that day and had little memory of what occurred thereafter.

Officer Darrell Sirmans, a Roane County criminal investigator, contradicted the defendant's suppression hearing testimony. Both the content of his interview and the defendant's formal statement were made, according to the officer, after the defendant had been fully informed of his *Miranda* rights. Sirmans stated that the defendant appeared lucid during the interview and that any seizure occurred sometime afterwards. Sirmans testified that the defendant signed the waiver, never asked for a lawyer, and fully understood his rights.

The trial court compared the defendant's signature with that appearing on the waiver of rights document. After observing the witnesses and examining the content of their testimony, the trial judge overruled the defense motion to suppress.

█ A confession must be freely, voluntarily, and knowingly made. *State v. Pritchett*, 621 S.W.2d 127 (Tenn.1981); *State v. Howard*, 617 S.W.2d 656 (Tenn.Crim.App. 1981). It is the duty of the trial judge to determine the voluntariness and the admissibility of the confession. *State v. Pursley*, 550 S.W.2d 949 (Tenn.1977). Once a finding has been made that the confession was free and voluntary, that determination is binding on the appellate court unless the evidence preponderates against that judgment. *State v. Chandler*, 547 S.W.2d 918 (Tenn.1977); *Graves v. State*, 512 S.W.2d 603 (Tenn.Crim. App.1973). In this case, it does not. Faced with conflicting statements, the trial court determined, as was its prerogative, to accredit the testimony of the officer and reject that of the defendant. Certainly, the documentation exhibited at the hearing fully supported the conclusions reached by the trial judge.

In a related argument, the defendant contends that other pre-trial statements he made to Officer Sirmans should also have

been suppressed. The evidence at issue took place in the original interview:

Q. Why did you get a gun?

A. I went prepared for trouble.

Q. What started this trouble and when?

A. I told the TVA man it was my money or his life.

Q. Anything else?

A. The trouble really started in 1967 when TVA put their power lines across our property and promised to pay my family for damages. We have lost 30 cows and I figure TVA owes us $350,000.00 in damages and this would not have happened if TVA had done what they were supposed to do.

Q. Do you think the loss of 30 cows justifies a man losing his life?

A. We have lost 30 cows and that should be worth 30 TVA people—I guess that the death of this TVA man pays for one cow.

Q. Let's say you're back home and a similar situation happened again with TVA people?

A. I guess the same thing would happen again.

The defendant asserts that the evidence was not relevant; that it did not tend to prove the existence of a fact at issue more or less probable. Tenn.R.Evid. 401. In the alternative, the defendant asserts that if relevant, the evidence should have been excluded because its probative value was outweighed by the danger of undue prejudice. Tenn. R.Evid. 403; *State v. Banks,* 564 S.W.2d 947 (Tenn.1978).

■ We disagree on each count. In our view, the evidence is an acknowledgment on the part of the defendant that he not only killed the victim but intended to do so. It established a motive. Certainly, that evidence meets the definition of relevancy. And, while the evidence is prejudicial to the defendant, it is not, in our judgment, "unfairly prejudicial." Just because evidence is particularly damaging does not mean that the defendant has an entitlement to its exclusion under the *Banks* test. *State v. Dulsworth,* 781 S.W.2d 277, 287 (Tenn.Crim.App.1989).

The state, of course, has the burden to establish both premeditation and deliberation. Proof of a motive can often supply these requisite elements. In our view, these statements had significant probative value that outweighed any danger of unfair prejudice.

### III

The defendant also contends that the trial court committed error by failing to adopt a special request for instruction. In the charge, the trial judge defined deliberation as follows:

A deliberate act is one performed with cool purpose. The mental state of the accused at the time he allegedly committed the homicide must be carefully considered in order to determine whether the accused acted with a cool purpose, and acted *without passion or provocation.*

(Emphasis added.)

The defendant's special request was at variance only with respect to the first sentence:

A deliberate act is an act performed with a cool purpose and *without passion or provocation.*

(Emphasis added.)

Unlike the defendant, we find little difference with the charge given and the instructions sought.

■ The Sentencing Commission Comments to the statute provide that the "phrase is designed to allow the defendant who kills another with passion or provocation to be adjudged guilty of either second degree murder or voluntary manslaughter...." Tenn. Code Ann. § 39-13-201(b). The instruction included in the Tennessee Pattern Jury Instructions is almost identical to that provided by the court in this case. T.P.I.—Crim. 7.01 (3d ed.). After careful examination, we find that the charge to the jury was satisfactory. The defendant's right to have this issue of fact properly submitted to the jury for resolution was fully honored. *See Poe v. State,* 212 Tenn. 413, 370 S.W.2d 488, 489 (1963).

## IV

Finally, the defendant submits that the trial court erred by allowing the testimony of Carolyn Scott and Linda Mason, employees of the Volunteer Electric Cooperative where the defendant paid his monthly utility bill. The defendant objected to the testimony on the basis that the threats the defendant made extended over a period of years. Again, the defendant makes alternative arguments: the evidence was not relevant but if so, the evidence was unfairly prejudicial. Tenn.R.Evid. 401 and 403.

Again, we disagree. In our view, the evidence was relevant on the issue of premeditation. The motive and intent of the defendant in the commission of a murder are almost always critical issues. In *State v. Haun,* 695 S.W.2d 546, 550 (Tenn.Crim.App. 1985), this court held that while "a lapse of time may, of course, affect [the relevance of evidence], it is the rational connection between events, not the temporal one, that determines whether the evidence has probative value." Certainly, the evidence was probative of the defendant's guilt. As previously stated, the mere fact that evidence is particularly damaging does not make it unfairly prejudicial. In our analysis, the probative value of the evidence was not "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn.R.Evid. 403.

The judgment is affirmed.

BIRCH, J., and DUNCAN, Special Judge, concur.