# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### APRIL SESSION, 1998

FILED

April 14, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

STATE OF TENNESSEE,           )
                              )
          Appellee            )     No. 02C01-9708-CR-00307
                              )
vs.                           )     SHELBY COUNTY
                              )
                              )     Hon. W. Fred Axley, Judge
JOHNNY O. CLARK,              )
                              )     (First Degree Murder)
          Appellant           )


For the Appellant:

**Tony N. Brayton**
Asst. Public Defender
201 Poplar, Suite 2-01
Memphis, TN  38103


**AC Wharton, Jr.**
District Public Defender

For the Appellee:

**John Knox Walkup**
Attorney General and Reporter

**Elizabeth T. Ryan**
Assistant Attorney General
Criminal Justice Division
450 James Robertson Parkway
Nashville, TN 37243-0493


**William L. Gibbons**
District Attorney General

**Edgar A. Peterson**
Asst. District Attorney General
Criminal Justice Complex
Suite 301, 201 Poplar Street
Memphis, TN  38103


OPINION FILED: _____

AFFIRMED


**David G. Hayes**
Judge

## OPINION

The appellant, Johnny O. Clark, was found guilty by a Shelby County jury of premeditated first degree murder. He was subsequently sentenced to a term of life imprisonment in the Department of Correction. In this appeal as of right, the appellant contends that the evidence is insufficient to support his conviction.

After a review of the record, we affirm the judgment of the trial court.

## Background

On the evening of March 14, 1995, a host of people, including family, acquaintances, and others gathered at the 3171 Nathan Street residence of Betty Clark. Included in this group was nineteen year old, Deron Cathey,[1] the victim in this case. As was customary, Mrs. Clark allowed various people to spend the night at her home. Mrs. Clark's home consisted of a living room, three bedrooms, a kitchen and a bathroom.[2] The only entrance to the house was through the front door and Mrs. Clark kept the only key. On this particular evening, Jerrekcha Clark, Mrs. Clark's granddaughter, and her boyfriend, Robert Patterson, went to sleep in the living room; Mrs. Clark and Eric Johnson, Jerrekcha's nine year old son, were sleeping in the front bedroom; Mose Dire, a family friend, and Deron Cathey occupied the middle bedroom; and Felix Lockett, "an old guy," and Tony Valentine, the appellant's brother, retired to the rear bedroom. Betty Clark is the mother of the appellant. Although the appellant usually stayed at his mother's house, he had been absent from the residence for the past three days.

---

[1]Deron Cathey is also referred to as Desron, Ron, or Darren in the record. He is also referred to by his father's surname, Taylor.

[2]Testimony at trial indicated that the living room and one bedroom were located in the front of the house. A hallway led from the living room to the kitchen. The only access to the two rear bedrooms was through the front bedroom.

At approximately 3:15 a.m., on March 15, Tony Valentine was awakened by the appellant and Mose Dire in the kitchen. The appellant was getting some clothes. Valentine noticed that Deron Cathey was in the middle bedroom awake. Valentine confronted the appellant in the kitchen and asked him to leave the home because of previous altercations with Deron Cathey.[3]  The appellant "was like wanting to go at [Deron] but I told him not to. . . like he wanted to break at him but I stopped him." Valentine then escorted the apparently angry appellant to the front door of the residence and locked the door.

Sometime later that morning, around 5:00 a.m., the appellant returned to his mother's house and began knocking on the front door. Jerrechka and Mrs. Clark were awakened by the noise. Mrs. Clark told Valentine to let the appellant in the house. Jerrechka and Mrs. Clark then went back to sleep. The appellant accompanied Valentine to the rear bedroom where he told his brother, "I'm going to sleep in my bed."  At this time, Valentine noticed that, although Mose Dire was asleep in the middle room, Deron Cathey was awake and sitting on the bed. Valentine then went back to sleep.

Shortly thereafter, the sleeping residents were awakened by the sound of gunfire. Valentine awoke to find the appellant "bent over and shooting [Deron Cathey]." Mose Dire observed Deron Cathey laying across the bed with his hands raised palm up in the air. Cathey was not armed with a weapon and begged the appellant, "[p]lease don't do this." After firing multiple gunshots at the unarmed Cathey, the appellant ran out the front door of the house. Jerrechka Clark noticed the front door closing, but was unable to identify the person. Tony Valentine then called for an ambulance and the police.

---

[3]At trial, Valentine explained that, three days earlier, the appellant and Deron Cathey had been involved in a verbal argument regarding Phyllis, the appellant's girlfriend, and money apparently owed to Cathey. Cathey may have been armed with a weapon during this altercation. The appellant's mother, Betty Clark, confirmed that the appellant and Deron had been arguing over something for about a month. In the appellant's defense, she testified that Cathey had told her that he was going to kill the appellant.

Memphis Police Officers Joseph Locastro and J.L. Simpson responded to the call from the Nathan Street address within two minutes of hearing the dispatch. They found the victim, Deron Cathey, lying on the floor, between a couch and a bed, in a bedroom on the east side of the house. The victim had sustained multiple gunshots wounds. The officers secured the scene, began preliminary investigations, and identified the appellant as the suspect. However, no weapons were discovered at the scene nor did the officers locate any spent shells or bullet holes. All of the witnesses at the scene testified that no weapons were kept in Betty Clark's residence, as she forbade them. Around 6:15 a.m, Officer Locastro was outside on the front porch of the house when he spotted the appellant emerging from between two houses. The appellant was placed under arrest, but no weapon was discovered on his person or in the area from which he emerged.

Paramedics from the Memphis Fire Department arrived at the scene at 5:31 a.m. and proceeded to transport the victim to a local hospital. The victim, whose condition deteriorated in transport, was pronounced dead at 7:54 a.m. Dr. O.C. Smith performed the autopsy on the victim. He determined that the victim had died from multiple gunshot wounds. Dr. Smith testified that the victim had been shot four times: in his right upper lip; in his left back; in his right front chest, and in the backside of his left upper arm.

At trial, the appellant testified in his own behalf. He stated that he arrived at 3171 Nathan Street at 5:05 a.m. in order to change his clothes. He explained that

> [w]hen I reached in my drawer to get my cologne to put on, and
> [Deron] stepped up to the door and asked me, say, 'You ready for you
> ass whooping.' So I just looked at him and he walked off. And when
> he walked off, he went to the right where guns are kept there in the
> house. And so when I put my cologne back in the drawer, I looked. . .
> up, he was coming toward me and I shot him. I shot him as he
> stepped into my room coming toward me. . . . I was scared.

4

After the appellant fled the house, he threw the gun in a field located at the intersection of "Crystal and Baltic."[4] The appellant admitted that he had purchased the gun, a .38 revolver, earlier that evening for "40 something dollars" from a "guy named . . . Mac" on the street.

The appellant stated that, three days prior to the shooting, he and Deron had an argument and the appellant had to escape from the kitchen window because Deron was armed with a weapon. He believed that "they were planning to get me, because Deron had hit Phyllis in the eye and broke her glasses and hit her under here. And she was a friend of mine. . . ." The appellant explained that Deron was involved in drugs and that drugs were sold out of his mother's house. Consequently, he stated that a lot of guns were kept in the residence, hidden in the air conditioner and under the couch. He alleged that the State's witnesses lied during their testimony.

**Analysis**

The appellant contends that a rational trier of fact could not find, from the evidence presented at trial, that the appellant acted with premeditation and deliberation.[5] Specifically, he argues that the proof fails to establish that the homicide was "committed with coolness and reflection and without passion or provocation." Thus, he concludes his conviction for premeditated first degree murder cannot stand. We disagree.

---

[4]The weapon used by the appellant was never recovered.

[5]At trial, the appellant argued self-defense. The jury, by their verdict, rejected this theory, finding that the killing was not justified. On appeal, the appellant concedes "while [the appellant's] fear may not have been enough to give rise to a defense of self-defense, it does indicate that the appellant acted in the passion and fear of the moment. . . . [ergo,] the proof would only support a conviction for second degree murder unless the State could show that premeditation and deliberation preceded the struggle."

When there is a challenge to the verdict based on the sufficiency of the evidence, this court must review the evidence in the light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); Tenn. R. App. P. 13(e). We do not reweigh or reevaluate the evidence; these are issues resolved by the trier of fact. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Furthermore, a guilty verdict accredits the testimony of witnesses for the State and a presumption of guilt replaces the presumption of innocence. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). The appellant bears the burden of proving that the evidence was insufficient to support the jury verdict in his case. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

On the date of this offense, first degree murder not committed in the perpetration of a crime required proof of the "intentional, premeditated and deliberate killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1994 Supp.). A death caused by another is presumed to be second degree murder. State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992). Thus, the State must prove premeditation and deliberation to raise the offense to first degree murder. Id. Premeditation necessitates "the exercise of reflection and judgment," Tenn. Code Ann. § 39-13-201(b)(2) (1991), "includ[ing] instances of homicide committed by poison or lying in wait," and requiring "a previously formed design or intent to kill." State v. West, 844 S.W.2d 144, 147 (Tenn. 1992). Deliberation, on the other hand, is defined as a "cool purpose . . . formed in the absence of passion." Brown, 835 S.W.2d at 538 (citations and internal quotations omitted). Deliberation also requires "some period of reflection, during which the mind is free from the influence of excitement." Id.; see also Tenn. Code Ann. § 39-13-201(b)(2).

6

The elements of premeditation and deliberation are questions for the jury and may be inferred from the circumstances surrounding the killing. State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993), perm. to appeal denied, (Tenn. 1994). Because the trier of fact cannot speculate as to what was in the killer's mind, the existence of facts of premeditation and deliberation must be determined from the appellant's conduct in light of the surrounding circumstances. State v. Wright, No. 01C01-9503-CC-00093 (Tenn. Crim. App. at Nashville, Jan. 5, 1996). Although there is no strict standard governing what constitutes proof of premeditation and deliberation, several relevant circumstances are helpful, including: the use of a deadly weapon upon an unarmed victim; the fact that the killing was particularly cruel; declarations by the defendant of his intent to kill; the making of preparations before the killing for the purpose of concealing the crime; and the procurement of weapons immediately prior to the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997) (citing Brown, 836 S.W.2d at 541-542). Additional factors from which a jury may infer premeditation and deliberation include planning activities by the appellant prior to the killing, the appellant's prior relationship with the victim from which motive may be inferred, and the nature of the killing from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design. Gentry, 881 S.W.2d at 4-5 (citation omitted).

Reviewing the present case in the light most favorable to the State, the appellant and the victim had an oral argument three days prior to the homicide. See Gentry, 881 S.W.2d at 5 (while motive is not an element of the offense, its proof may reflect upon the elements of premeditation and deliberation). The appellant purchased a weapon within several hours of the incident. He also was aware that Deron Cathey had been staying at his mother's Nathan Street residence. See Brown, 836 S.W.2d at 541 (facts about what the defendant did prior to the killing which show he was engaged in planning activity support an inference of

7

premeditation and deliberation).  At 3:00 a.m. the next morning, he went to his mother's house, where his brother, Tony Valentine, instructed him to leave because the appellant "was . . wanting to go at [Deron] Cathey."  He returned several hours later and found Deron Cathey unarmed in the middle bedroom.  See  Bland, 958 S.W.2d at 660.  Tony Valentine and Mose Dire witnessed the appellant shoot Deron multiple times despite Deron's pleas.  Gentry, 881 S.W.2d at 4-5.  The weapon was fired at close range.  The appellant ran out of the house and subsequently threw the weapon in a vacant field.  See  West, 844 S.W.2d at 148 (fact that defendant disposed of weapon immediately after shooting supports theory that homicide was committed in the absence of passion).

From these facts, we conclude that a reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  Accordingly, the judgment of conviction for the offense of first degree murder is affirmed.

_____
DAVID G. HAYES, Judge


CONCUR:


_____
WILLIAM M. BARKER, Judge


_____
JOE G. RILEY, Judge

8