# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs December 9, 2015

## BOBBY J. CROOM v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Madison County**
**No. C-15-58     Roy B. Morgan, Jr., Judge**

---

**No. W2015-01000-CCA-R3-PC  -  Filed February 19, 2016**

---

The petitioner, Bobby J. Croom, appeals the denial of his petition for post-conviction relief from his rape of a child and aggravated sexual battery convictions. The petitioner argues that he is entitled to relief because: (1) the State failed to make a proper election of offenses at trial; (2) his convictions violate double jeopardy; (3) his conviction for aggravated sexual battery violates due process; and (4) he received ineffective assistance of counsel. After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

Joshua B. Dougan, Jackson, Tennessee, for the appellant, Bobby J. Croom.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; James G. (Jerry) Woodall, District Attorney General; and Alfred L. Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The petitioner was convicted by a Madison County Circuit Court jury of three counts of rape of a child and three counts of aggravated sexual battery as a result of his alleged sexual interactions with his girlfriend's eight-year-old daughter. State v. Bobby Joe Croom, No. W2011-00461-CCA-R3-CD, 2012 WL 1656718, at *1 (Tenn. Crim. App. May 10, 2012). The petitioner appealed and, on direct appeal, this court reversed and dismissed two of his rape of a child convictions and two of his aggravated sexual battery convictions following a determination that there was no proof presented at trial

that the offenses occurred within the time periods charged.  Id. at *8.  This court also reversed the remaining rape of a child and aggravated sexual battery convictions and remanded for a new trial on those two charges.  Id.  Following a retrial, a jury convicted the petitioner as charged of rape of a child and aggravated sexual battery and imposed an effective sentence of fifty years.  State v. Bobby Joe Croom, No. W2013-01863-CCA-R3-CD, 2014 WL 3511017, at *1 (Tenn. Crim. App. July 11, 2014), perm. app. denied (Tenn. Oct. 17, 2014).  This court affirmed those convictions on appeal, and the Tennessee Supreme Court denied the petitioner's application for permission to appeal.  Id.

The underlying facts of the case were recited by this court on direct appeal following the retrial as follows:

**State's Proof**

. . . [T]he minor victim, was twelve years old at the time she testified at trial.  The victim stated that in July 2009, when the offenses in this case occurred, she was eight years old and lived with her mother, two brothers, and [the petitioner] . . . in Jackson.  She stated that she sometimes called [the petitioner] "Dad."

The victim stated that her mother worked at McDonald's and [the petitioner], who did not have a job at the time, took care of her while her mother worked.  In July 2009, the victim informed her uncle, and later her grandmother, that [the petitioner] had been touching her "in a bad way."  During trial, the victim explained that boys and girls have a private area between their legs, which she called "[t]heir middle part," that should not be touched and that boys and girls have a private area on their "behind" that should not be touched.  She also stated that girls have a private area on their chest that she referred to as "[b]oobs."  The victim identified these private areas on diagrams depicting a nude male and female child, which were entered into evidence.

The victim said she was at her grandmother's house when she told her grandmother that [the petitioner] had sexually abused her.  She said that the abuse occurred . . . at her mother's house in the morning while her mother was at work.  At the time, she and [the petitioner] were the only people in the house because her brother was at his paternal grandmother's house and her other brother was at his aunt's house.  After she heard [the petitioner] come home, he walked into her room.  [The petitioner] picked her up from her bed and carried her into her mother's bedroom.  He placed

2

her on the bed, removed her t-shirt and shorts, and removed his own clothes. [The petitioner] got into the bed with the victim and placed her on top of him with her head at his chest. He then began "[r]ubbing" her "middle part" either with his hand or his own "middle part." After several minutes, [the petitioner] placed the victim on her back on the bed. He lay on his stomach and licked her "middle part." The victim demonstrated to the jury the position of her body during the incident by lying on her back with her legs spread apart. She also demonstrated how [the petitioner] lay on his stomach, propping himself up on his elbows during the incident. The victim also stated that [the petitioner] spat on her "middle part," although she did not know why he did this. She said that after a few minutes, [the petitioner] stuck his "middle part" into her "middle part," which "hurt." The victim referenced the "middle part[s]" she had circled on the diagrams of the male and female children. The victim demonstrated the position of her body at time of penetration by lying on her back with her legs spread apart. She also showed the jury how [the petitioner] sat on his knees with his legs folded under him while he rocked back and forth in a thrusting motion. She said that during the rape, [the petitioner] told her, "You're the best I ever had."

The victim stated that on Saturday, the day after she was sexually abused, she went to her grandmother's house. When her grandmother returned home from a yard sale, she told her grandmother that [the petitioner] had sexually abused her.

The victim said that she knew the difference between a truth and a lie and asserted that she was telling the truth about [the petitioner]'s abuse. She also said she told the doctor who examined her the truth about [the petitioner] sexually abusing her. The victim said she first told her uncle that [the petitioner] had sexually abused her because she "felt like [she] was in a safer place to tell someone." She said she did not tell her mother first because her mother "was working all the time."

The victim acknowledged that . . . her brother's aunt, sometimes babysat her and her brother. She said that she sometimes spent the night at [her brother's aunt]'s house if her mother was working late but that she usually spent the night at her grandmother's house when her mother was working at night and generally went to her grandmother's house on Friday night or Saturday morning. The victim stated that [the petitioner] sexually abused her the day before she went to her grandmother's house and that she went to her grandmother's house on Saturday morning.

3

. . . [T]he victim's maternal grandmother, testified that she called the Jackson Police Department on Friday, July 24, 2009, after the victim told her on Thursday, July 23, 2009, that [the petitioner] had sexually abused her. [The victim's maternal grandmother] stated that she did not call the police until the next day because she wanted [the petitioner] "dead."

[The victim's maternal grandmother] said that she sometimes took care of the victim and had been taking care of the victim the week that the victim told her about the sexual abuse. She said that she picked up the victim on Saturday, July 18, 2009, with the intent to take her to church the following day. [The victim's maternal grandmother] stated that she kept the victim at her house from Saturday, July 18, 2009, to Friday, July 24, 2009.

[The victim's maternal grandmother] stated that her son had already informed her that [the petitioner] had sexually abused the victim before the victim told her about the abuse. During the period from July 18, 2009, to July 24, 2009, [the victim's maternal grandmother] said the victim did not act as if she were hurt or injured, but she noticed that the victim was quiet. [The victim's maternal grandmother] said that when she picked up the victim on July 18, 2009, [the petitioner] was present, and the victim did not act differently around him.

. . . [T]he victim's mother, testified that in July 2009 she was dating [the petitioner], who lived with her and her children. At that time, [the victim's mother] was working at McDonald's, and [the petitioner] did not have a job. Because it was summer vacation, [the petitioner] took care of her children while she worked. [The victim's mother] stated that on Friday, July 17, 2009, and Saturday, July 18, 2009, she worked from 7:00 a.m. to 2:00 p.m. She said she did not work on Sunday, July 19, 2009. [The victim's mother] could not recall whether she drove herself to work or whether [the petitioner] drove her to work on Friday, July 17, 2009.

[The victim's mother] said that she initially heard that [the petitioner] had sexually abused the victim from her brother and that she later talked with her mother about the abuse. She said she did not contact the police the day she found out about the abuse because she did not know what to do. However, the next day, she called the police to report the abuse. When she learned of the abuse, she informed [the petitioner] that the victim had said that he had been "messing with her" and that she needed to

4

talk to him about it.  When [the petitioner] did not respond, [the victim's mother] told him to get his things and leave, which he did.  She said [the petitioner] never denied the allegations and did not appear upset when she called him a child rapist.

[The victim's mother] said that at the preliminary hearing in this case, she heard the victim say [the petitioner] had told her, "Ain't you the best I ever had."  After the preliminary hearing, [the petitioner] wrote her letters to which she did not respond.  In one of the letters, [the petitioner] wrote, "And who told her to say, 'Ain't this the best you ever had?'  B[——–], I told you that s[——]."  [The victim's mother] explained that [the petitioner] had used the same phrase with her when they had sexual relations at the time they were dating.  In a different letter, [the petitioner] wrote, "I love you, Boo.  I really f[ ] do.  I always have and always will.  You're the best I ever had."  Later, in the same letter, [the petitioner] wrote, "N[———] didn't like me because I f[———] on their ho's and ho's didn't like me because I f[———] on b[ ].  So that's what's up.  That b [——] was broke when I met her and back broke and f[———] up now since I'm gone.  I was the best that b[——] ever had."  She stated that [the petitioner] was not talking about her or the victim when he used that phrase in the later portion of the letter.

[The victim's mother] acknowledged that [the victim's brother's aunt] sometimes babysat the victim and her other children while she was working but usually kept them at night, sometimes throughout the night.  She said [the petitioner] sometimes drove her to work and acknowledged that [the petitioner] had driven her to work at some point during the period from July 12, 2009, to July 18, 2009.  [The victim's mother] said that when [the petitioner] drove her to work, he would either drop off the children at [the victim's brother's aunt]'s house or would keep them himself.  She admitted that members of [the petitioner]'s family often visited her home but asserted that there were usually not any guests at her house by the time she got home from work at night.  [The victim's mother] acknowledged that [the petitioner] had a son and a daughter from a prior relationship who sometimes visited her home.

[The victim's mother] said she did not notice the victim in any pain during the period from July 12, 2009, to July 18, 2009.  However, during that period, she remembered the victim "having more attitude towards people, but other than that she was pretty much okay."  She acknowledged that the victim was not trying to avoid [the petitioner] during that period.

5

[The victim's mother] also acknowledged that during the summer of 2009 there was a song by Lil Wayne and Drake that possibly contained the lyric, "B [——], you're the best I ever had."

Danielle Jones, an investigator with the violent crimes unit of the Jackson Police Department, testified that [the petitioner]'s sexual abuse of the victim was disclosed to the police on July 24, 2009. She stated that on July 25, 2009, she attempted to contact [the petitioner]. After several unsuccessful attempts to reach him, [the petitioner] finally answered the phone and told her that he was in Memphis with his brother. Investigator Jones told [the petitioner] that she needed to speak with him about some allegations that had been made against him, and [the petitioner] said he would meet with her. However, [the petitioner] never came by the police department to talk with her. Investigator Jones tried to call [the petitioner] a few more times but was unable to speak with him until he was taken into custody.

Dr. Lisa Piercey, a pediatric physician, was declared an expert in pediatrics and the maltreatment of children. She stated that she had seen over two thousand children who were believed to be the victims of sexual abuse. On July 24, 2009, Dr. Piercey evaluated, diagnosed, and treated the victim. On that date, she stated that the victim was three feet, ten inches tall and weighed forty-eight pounds, which was small for an eight-year-old girl. Dr. Piercey stated that "the goal of any medical evaluation" was to diagnose and, if necessary, treat the patient. As a part of her evaluation, she obtained a medical history from the victim and her mother. She stated that medical histories are "the most important part of any medical evaluation" because diagnoses are based in large part on a patient's medical history. In addition, she stated that the identity of the individual alleged to have sexually abused a child is important because the child needs to be protected from that person from that point forward. Dr. Piercey explained that if the perpetrator is allowed to have contact with the child, then the child is in continued danger, which also affects the testing and treatment of the child.

Dr. Piercey stated that she intentionally knows nothing about the allegations involving her patients in order to avoid having preconceived notions about what has occurred. At the time of the victim's appointment, she did not know whether the victim was there for physical abuse or sexual abuse. When Dr. Piercey asked the victim why she had been brought in to see her that day, the victim immediately replied, "My mom's boyfriend, Tyson Croom, has been giving me bad touch." When Dr. Piercey asked the

victim about when the abuse had occurred in order to determine whether a rape kit was necessary, the victim stated that the most recent abuse occurred a few days earlier. Dr. Piercey explained that children typically do not have a concept of time, so it was appropriate for the eight-year-old victim not to be able to answer her question more specifically than a "few days ago."

Dr. Piercey stated that the victim's description of the abuse was necessary in order for her to diagnose and treat the victim. The victim told her, "[the petitioner] would feel on my middle part with his hands on the inside and it hurt. He put his mouth on my middle part, and then he would put his middle part in my middle part and it hurt." The victim also told her that "[the petitioner] put his fingers in my butt."

Dr. Piercey said she also performed a physical examination of the victim. Using a colposcope, she observed that a substantial portion of the victim's hymen was absent. Dr. Piercey stated that the absence of hymenal tissue was indicative of blunt force penetrating trauma and that the victim's injury was consistent with the victim's disclosure that [the petitioner] had penetrated her with his penis. She stated that the amount of the victim's absent hymenal tissue was very unusual for an eight-year-old. She explained that because hymens are shaped like a collar with a hole, around ninety to ninety-five percent of females who have been penetrated do not show any abnormality in their hymens when examined. After conducting the physical exam, Dr. Piercey's diagnosis of the victim was "child sexual abuse." She then made the following finding regarding the victim: "The . . . absence of hymenal tissue in the posterior rim of the hymen is definitive evidence for blunt force penetrating trauma. The timing or frequency of the trauma cannot be determined based on examination alone, but there are no acute injuries present."

After completing her evaluation, Dr. Piercey formed a treatment plan for the victim. The first step in this treatment plan was to terminate all contact with the alleged perpetrator to ensure the victim's safety. The second step was to list all of the tests for sexually transmitted diseases that she had done on the victim. The third step was to note that a rape kit was unnecessary because too much time had elapsed from the last incident of abuse to collect DNA evidence. The fourth step was to reassure the victim and her mother that the victim was healthy and would be fine. The fifth step was to recommend long-term counseling for the victim. The sixth and final step was to recommend that the victim follow up with her regular doctor. At the end of the appointment, Dr. Piercey asked the victim if she

wanted to tell her anything else, and the victim replied that [the petitioner] often told her, "I was the best he ever had."

Dr. Piercey stated that it would be impossible for the victim's penetrating trauma to result from activities like riding a bike unless the bicycle seat actually penetrated the vagina. She said she did not observe any lacerations, tears, abrasions, or any other injuries to the victim during the physical examination.

## Defense's proof

Beverly Croom, the [petitioner]'s aunt, testified that she began packing her things to move to a different home in the middle of July 2009. She stated that [the petitioner] helped her move during the period from July 17, 2009, to July 20, 2009. Specifically, she stated that on Friday, July 17, 2009, and Saturday, July 18, 2009, [the petitioner] arrived at her house at 8:00 a.m. and left at 3:00 or 4:00 p.m. She stated that the victim was not with [the petitioner] any of the days he helped her move.

[The petitioner's aunt] acknowledged that she had earlier testified that she moved "around about the second week of July" and that she did not know the exact dates of her move. She said that when the allegations regarding the sexual abuse of the victim arose, [the petitioner] went out of town for a week or two for a family reunion in Michigan, where his father lived.

. . . [T]he victim's aunt, testified that in July 2009 she sometimes babysat the victim and her brothers. She said that the time of day that she kept them varied and that they sometimes spent the night at her home.

Gloria Herron, [the petitioner]'s mother, testified that in July 2009 she often visited [the petitioner] at the home he shared with [the victim's mother] and [the victim's mother]'s children. She stated that she often visited with the victim and that the victim sometimes came over to her house. Herron stated that she went to [the petitioner]'s home in the evenings the week of July 12, 2009, through July 18, 2009, although she could not remember the specific dates. During those visits, she said the victim did not appear to be hurt or in pain, and she did not observe any changes in the victim's behavior. She also said the victim did not try to avoid [the petitioner] and did not act like she was afraid of him.

8

Herron acknowledged previously testifying that she did not know exactly when in July 2009 she went to [the petitioner]'s home. She also acknowledged that she did not know if she visited the victim's home during the period from July 12, 2009, to July 18, 2009. Although Herron stated that she went over to [the petitioner]'s home every evening, she acknowledged that she had previously testified that she visited [the petitioner]'s home once a week. She acknowledged that her memory of her visits was probably more accurate at the time of her testimony two and a half years earlier than at the current time. She did not dispute her prior testimony in this case.

Latosha Croom, [the petitioner]'s cousin, testified that she frequently visited [the petitioner] in July 2009. She said she played cards and had cookouts with [the petitioner] and the children at the time and often stayed late into the night. [The petitioner's cousin] admitted she did not remember any specific details from any date that she visited [the petitioner]'s home in July 2009.

Bobby Joe Croom, 2014 WL 3511017, at *1-6 (footnotes omitted).

The petitioner filed a timely *pro se* petition for post-conviction relief and, following the appointment of counsel, an amended petition was filed. In his petitions, the petitioner raised numerous allegations, including those pursued on appeal: (1) the State failed to make a proper election of offenses at trial; (2) his convictions violate double jeopardy; (3) his conviction for aggravated sexual battery violates due process; and (4) he received ineffective assistance of counsel. We will limit our recitation of the testimony at the evidentiary hearing to that relevant to the issues on appeal.

The post-conviction court conducted an evidentiary hearing, at which the petitioner testified that he was represented at his second trial by counsel. He said that counsel "had attitude like he didn't want to help me." He elaborated that counsel "just stood there and stared at the wall" during their meetings. He claimed that, when he showed counsel "documents that [he] wanted [counsel] to look at to prepare[,]" counsel "waved [him] off . . . [and] said, '[t]hat's no good.'" The petitioner stated that he met with counsel "[a] couple of times" in preparation for trial, and he provided counsel with information about the case and witnesses that might be helpful.

The petitioner testified that counsel did not object to demonstrative testimony by the victim that the petitioner believed to be "very prejudicial." He also maintained that counsel failed to ask questions on cross-examination that the petitioner had instructed him to ask. For example, he asked counsel to question the victim about the date of the

offense included in the arrest warrant versus what was said at trial. He also claimed that he asked counsel to use a statement given by the victim's mother to cross-examine witnesses. He elaborated that the statement contained a date that contradicted trial testimony regarding the date of the offense. He further elaborated that the police report contained yet another, earlier date of the offense, and that counsel should have utilized it in cross-examination. The petitioner insisted that the dates were of particular importance because he raised an alibi defense.

The petitioner testified that counsel failed to object to a report prepared by Dr. Piercey.[1] He claimed that the report was inaccurate and also contradicted Dr. Piercey's testimony. Moreover, in the motion for new trial, counsel did not accurately describe the scope of the issue. The petitioner additionally claimed that the State failed to make an election of offenses.

On cross-examination, the petitioner admitted that there was a hearing on the admissibility of Dr. Piercey's testimony and that the trial court determined that "[c]ertain things were admissible." However, he insisted "that don't make it right, though. . . . I could have appealed that."

Counsel testified that he did not want the jury to see evidence indicating that the petitioner had been originally charged with and convicted of additional offenses. Therefore, he was careful to avoid questioning witnesses about additional dates because such questions could have elicited testimony about other allegations. He said that he specifically avoided questioning the victim's mother about a prior statement because it impeached testimony that helped establish the petitioner's alibi. Counsel noted that the admission of demonstrative evidence fell within the discretion of the trial court.

Counsel recalled that he filed a motion in limine objecting to Dr. Piercey's testimony and report, and he raised the issue of Dr. Piercey's testimony on appeal but was unsuccessful. On cross-examination, counsel stated that he specifically included the issue regarding Dr. Piercey's report in his motion for new trial. Counsel agreed that the victim's demonstrative evidence was a dramatic moment during trial and would have been damaging to the petitioner. With regard to election of offenses, counsel recalled that it was discussed at trial, and the State made an election in its closing. He recalled that portion of the trial was not transcribed.

After the hearing, the post-conviction court made oral findings, followed by a written order, denying the petition. The court found that there was nothing inflammatory or obscene about the victim's demonstrative testimony, and her testimony was highly

---

[1]We utilize the spelling of the doctor's name as that in our opinion on direct appeal.

probative and relevant and outweighed any prejudice. The court recalled that a full hearing was held regarding Dr. Piercey's report and two redactions were made from it. As to input that was given to Dr. Piercey by the victim's mother, the court found that there was "no probability that any different result would occur if that had been handled any differently." The court noted that this court affirmed the admission of Dr. Piercey's report and also concluded that even if the admission of the victim's mother's statements was in error, it did not affect the outcome of the trial.

With regard to election of offenses, the court noted that it was "read verbatim to the jury as to what specifically the State was relying on regarding those two counts which were submitted to them at the trial." The court lastly found that the petitioner's double jeopardy claim was without merit and that "the evidence was sufficient to support separate convictions for each offense." The court further found that "trial counsel was not ineffective and provided services well within the scope and bounds required by trial attorneys in such cases."

## ANALYSIS

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

On appeal, the petitioner raises four issues: (1) the State failed to make a proper election of offenses at trial; (2) his convictions violate double jeopardy; (3) his conviction for aggravated sexual battery violates due process; and (4) he received ineffective assistance of counsel. The petitioner further claims that the "aggregate prejudicial effect of the errors" entitles him to relief.

As to the petitioner's first three arguments, regarding election, double jeopardy, and due process, the State argues, and we agree, that the petitioner waived those claims for failing to raise them on direct appeal. "Post-conviction relief is not a forum to review

11

errors of law as a substitute for direct appeal." State v. McClintock, 732 S.W.2d 268, 272 (Tenn. 1987). "A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented. . . ." Tenn. Code Ann. § 40-30-106(g). Where a petitioner had the opportunity to present claims on direct appeal but failed to do so, those claims are waived. See Dedrick Lamont Patton v. State, No. M2009-01472-CCA-R3-PC, 2010 WL 1425569, at *9-10 (Tenn. Crim. App. Apr. 9, 2010).

In addition, regardless of waiver, the petitioner did not prove these three claims by clear and convincing evidence. First, the post-conviction court made a factual finding that "the evidence supporting the election made by the State was included and read to the jury." Counsel testified at the evidentiary hearing that the State made the necessary election at trial and that where the election occurred was simply not transcribed. The post-conviction court properly concluded that the petitioner failed to demonstrate this claim by clear and convincing evidence.

Second, the post-conviction court properly concluded that the petitioner failed to demonstrate that his convictions violate double jeopardy. The petitioner concedes in his brief that case law contradicts his argument that rape of a child and aggravated sexual battery are the same offense for double jeopardy purposes. Specifically, this court has held, "Because the elements of aggravated sexual battery and rape of a child are not the same and neither is a lesser included offense of the other, we conclude that the legislature intended to permit multiple punishments and that they are not the same offense for double jeopardy purposes." State v. Dallas Jay Stewart, No. M2011-01994-CCA-R3-CD, 2013 WL 3820992, at *37 (Tenn. Crim. App. July 22, 2013). Thus, even if the petitioner had not waived this issue, the post-conviction court properly concluded that he failed to demonstrate his claim of a double jeopardy violation.

Third, as to the petitioner's due process claim, not only did he fail to present it on direct appeal, he also failed to include it in his petition or amended petition for post-conviction relief. Thus, the post-conviction court made no ruling on the matter for this court to review. Issues not included in a post-conviction petition may not be raised for the first time on appeal and are waived. See Walsh v. State, 166 S.W.3d 641, 645 (Tenn. 2005) ("Issues not addressed in the post-conviction court will generally not be addressed on appeal."); Cauthern v. State, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004) ("[A]n issue raised for the first time on appeal is waived.)

We will thus now address the petitioner's remaining issue regarding his claim that he received ineffective assistance of counsel.

12

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Moreover, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

As to this claim, the petitioner specifically asserts that he received ineffective assistance of counsel because counsel failed to include "two important issues" in the motion for new trial, which meant the issues were not preserved for appellate review. He claims that, in the motion for new trial, counsel should have challenged: (1) Dr.

13

Piercey's use of statements from the victim's mother as being hearsay and (2) demonstrative testimony by the victim.

With regard to Dr. Piercey's testimony, the petitioner claims that it was error for the trial court to allow Dr. Piercey to testify regarding statements made to her by the victim's mother and to include the victim's mother's statements in her report. In the motion for new trial, counsel only argued that the trial court erred in allowing Dr. Piercey to testify about the victim's statements to her, and did not argue any error regarding Dr. Piercey's testifying about statements made to her by the victim's mother. The petitioner asserts that, if counsel had included the issue in the motion for new trial, "this Court may well have found [on direct appeal] that the trial court erroneously admitted hearsay that aided the State in convicting [the petitioner]."

In its order, the post-conviction court noted that, on direct appeal, this court affirmed the trial court's admission of Dr. Piercey's testimony and report and "also concluded that even if the admission of the mother's statements was in error it did not affect the outcome of the trial." The post-conviction court noted that this court thoroughly considered and ruled on the issue and that there was "no probability of there being a different result." Moreover, the petitioner only alleges that the court "may well have" reached a different conclusion had the issue been raised, which falls short of proving that a reasonable probability exists that, but for counsel's alleged error, the results would have been different. As such, the petitioner has failed to prove any prejudice due to counsel's failure to include this issue in the motion for new trial.

With regard to demonstrative testimony by the victim, the petitioner claims that the victim's demonstration of various physical positions and acts that took place between she and the petitioner "could easily be described through spoken testimony alone." He claims that the demonstrations were unfairly prejudicial and, had counsel preserved the issue for appellate review, "this Court easily could have found that this demonstrative testimony was inadmissible due to its great danger of unfair prejudice."

In ruling on this issue, the post-conviction court noted that the admissibility of demonstrative evidence was in the sound discretion of the trial court. The court observed that the victim "simply stepped down and demonstrated what happened to her the same way officers often demonstrate field sobriety tests in DUI cases. She was fully clothed." The court concluded that there was nothing inflammatory about the demonstrative proof and that the "demonstration was highly probative and that probative value outweighed any prejudice." This court has held that "the mere fact that evidence is particularly damaging does not make it unfairly prejudicial." State v. Gentry, 881 S.W.2d 1, 7 (Tenn. Crim. App. 1993). The petitioner has failed to prove a reasonable probability that this

court, on direct appeal, would have found the demonstrative testimony by the victim to be unfairly prejudicial such that the trial court abused its discretion in allowing it.

The petitioner lastly asserts that he is entitled to relief due to cumulative error. However, having found no errors, we conclude that the petitioner is not entitled to relief on the basis of cumulative error.

## **<u>CONCLUSION</u>**

Based on the foregoing authorities and reasoning, we affirm the denial of the petition.

_____
ALAN E. GLENN, JUDGE